FILED
United States Court of Appeals
Tenth Circuit

June 25, 2014

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DEREK KITCHEN; MOUDI SBEITY;
KAREN ARCHER; KATE CALL;
LAURIE WOOD; KODY PARTRIDGE,
individually,

      Plaintiffs - Appellees,

v.

GARY R. HERBERT, in his official
capacity as Governor of Utah; SEAN
REYES, in his official capacity as
Attorney General of Utah,

      Defendants - Appellants,

and

SHERRIE SWENSEN, in her official
capacity as Clerk of Salt Lake County,

      Defendant.

No. 13-4178

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:13-CV-00217-RJS)**

Gene C. Schaerr, Special Assistant Attorney General, Salt Lake City, Utah (Brian L.
Tarbet, Chief Deputy Attorney General, Parker Douglas, Chief of Staff and General
Counsel, Stanford E. Purser, and Philip S. Lott, Assistant Utah Attorneys General, Salt
Lake City, Utah, and John J. Bursch, Warner Norcross & Judd LLP, Grand Rapids,
Michigan, and Monte N. Stewart, Boise, Idaho, with him on the briefs), for Defendants–
Appellants.

Peggy A. Tomsic, Magleby & Greenwood PC, Salt Lake City, Utah (James E. Magleby and Jennifer Fraser Parrish, Magleby & Greenwood PC, Salt Lake City, Utah, and Kathryn D. Kendell, Shannon P. Minter, David C. Codell, National Center for Lesbian Rights, San Francisco, California, with her on the brief), for Plaintiffs–Appellees.[*]

Before **KELLY**, **LUCERO**, and **HOLMES**, Circuit Judges.

**LUCERO**, Circuit Judge.

Our commitment as Americans to the principles of liberty, due process of law, and equal protection of the laws is made live by our adherence to the Constitution of the United States of America. Historical challenges to these principles ultimately culminated in the adoption of the Fourteenth Amendment nearly one-and-a-half centuries ago. This Amendment extends the guarantees of due process and equal protection to every person in every State of the Union. Those very principles are at issue yet again in this marriage equality appeal brought to us by the Governor and Attorney General of the State of Utah from an adverse ruling of the district court.

We are told that because they felt threatened by state-court opinions allowing same-sex marriage, Utah legislators and—by legislature-initiated action—the citizens of the State of Utah amended their statutes and state constitution in 2004 to ensure that the State "will not recognize, enforce, or give legal effect to any law" that provides "substantially equivalent" benefits to a marriage between two persons of the same sex as are allowed for two persons of the opposite sex. Utah Code § 30-1-4.1. These laws were

---

[*] The names of all amicus curiae parties are contained in Appendix A to this Opinion.

also intended to assure non-recognition irrespective of how such a domestic union might be denominated, or where it may have been performed.  Id.  Plaintiffs challenged the constitutionality of these laws and the district court agreed with their position.  Under 28 U.S.C. § 1291, we entertain the appeal of that ruling.

Our Circuit has not previously considered the validity of same-sex marriage bans. When the seed of that question was initially presented to the United States Supreme Court in 1972, the Court did not consider the matter of such substantial moment as to present a justiciable federal question.  Baker v. Nelson, 409 U.S. 810 (1972) (per curiam). Since that date, the seed has grown, however.  Last year the Court entertained the federal aspect of the issue in striking down § 3 of the Defense of Marriage Act ("DOMA"), United States v. Windsor, 133 S. Ct. 2675 (2013), yet left open the question presented to us now in full bloom:  May a State of the Union constitutionally deny a citizen the benefit or protection of the laws of the State based solely upon the sex of the person that citizen chooses to marry?

Having heard and carefully considered the argument of the litigants, we conclude that, consistent with the United States Constitution, the State of Utah may not do so.  We hold that the Fourteenth Amendment protects the fundamental right to marry, establish a family, raise children, and enjoy the full protection of a state's marital laws.  A state may not deny the issuance of a marriage license to two persons, or refuse to recognize their marriage, based solely upon the sex of the persons in the marriage union.  For the reasons stated in this opinion, we affirm.

# I

Utah residents Derek Kitchen and Moudi Sbeity have been in a loving, committed relationship for several years. The couple lives together in Salt Lake City, where they jointly own and operate a business. Kitchen declares that Sbeity "is the man with whom I have fallen in love, the man I want to marry, and the man with whom I want to spend the rest of my life." In March 2013, Kitchen and Sbeity applied for a marriage license from the Salt Lake County Clerk's office, but were denied because they are both men. Being excluded from the institution of marriage has caused Kitchen and Sbeity to undertake a burdensome process of drawing up wills and other legal documents to enable them to make important decisions for each other. Even with these protections, however, the couple cannot access various benefits of marriage, including the ability to file joint state tax returns and hold marital property. Sbeity also states that the legal documents the couple have obtained "do not and cannot provide the dignity, respect, and esteem" of marriage. The inability to "dignify [his] relationship" though marriage, Kitchen explains, communicates to him that his relationship with Sbeity is unworthy of "respect, equal treatment, and social recognition."

Laurie Wood and Kody Partridge are also Utah residents who wish to "confirm [their] life commitment and love" through marriage. They applied for a marriage license from the Salt Lake County Clerk's office in March 2013, but were denied because they are both women. This denial made Wood "feel like a second class citizen." The couple's inability to marry carries financial consequences. Because Partridge will be unable to obtain benefits under Wood's pension, the couple has procured additional life insurance

policies. Partridge states that she and Wood face "risks and stigmas that none of [her] heterosexual married friends and family ever have to face." She points to the example of her parents, who were married for fifty-five years, observing that her father never had to worry about his ability to be present or make medical decisions when his wife became terminally ill. Wood hopes that marriage to Partridge will allow "both society and our families [to] recognize the life commitment and love we feel for each other."

Karen Archer and Kate Call are also Utah residents in a loving, committed relationship. Archer, who suffers from chronic health problems, fears that the legal documents the couple has prepared will be subject to challenge if she passes away. Her past experience surviving other partners informs this fear. Although the documents she prepared in a prior relationship served their purpose when her former partner passed, Archer was ineligible to receive her partner's military pension benefits. Seeking the security enjoyed by other married couples, Archer and Call travelled to Iowa in July 2011, where they were wed. Because they could not be married in their home state, financial constraints dictated a modest wedding unattended by family and friends. "Despite the inconvenience and sad pragmatism of our Iowa marriage," Call explains, "we needed whatever protections and security we could get for our relationship" because of Archer's failing health. However, Utah does not recognize Archer and Call's marriage.

In March 2013, Kitchen, Sbeity, Wood, Partridge, Archer, and Call filed suit against the Governor and Attorney General of Utah and the Clerk of Salt Lake County (all in their official capacities). Plaintiffs challenged three provisions of Utah law

relating to same-sex marriage. Utah Code § 30-1-2(5) includes among the marriages that are "prohibited and declared void" those "between persons of the same sex." Id. In 2004, the Utah Legislature passed § 30-1-4.1, which provides:

> (1)(a) It is the policy of this state to recognize as marriage only the legal union of a man and a woman as provided in this chapter.
>
> (b) Except for the relationship of marriage between a man and a woman recognized pursuant to this chapter, this state will not recognize, enforce, or give legal effect to any law creating any legal status, rights, benefits, or duties that are substantially equivalent to those provided under Utah law to a man and a woman because they are married.
>
> (2) Nothing in Subsection (1) impairs any contract or other rights, benefits, or duties that are enforceable independently of this section.

Id. The Legislature also referred a proposed constitutional amendment, known as Amendment 3, to Utah's voters. It states:

> (1) Marriage consists only of the legal union between a man and a woman.
>
> (2) No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect.

Utah Const. art. I, § 29; see Laws 2004, H.J.R. 25 § 1.

The State's official voter pamphlet described rulings by courts in other states striking down statutory prohibitions on same-sex marriage as inconsistent with state constitutional provisions. In the "arguments for" section, written by a state representative and a state senator, the proponents argued that the Amendment was necessary to protect against a similar state-court ruling. They posited that the proposed amendment would not "promote intolerance, hatred, or bigotry" but would instead "preserve[ an] historic understanding of marriage" rooted in "government's strong interest in maintaining public

-6-

morality, the justified preference for heterosexual marriage with its capacity to perpetuate the human race and the importance of raising children in that preferred relationship." Opponents of the amendment argued that it "singles out one specific group—people who are our relatives, neighbors, and co-workers—to deny them hundreds of rights and protections that other Utahns enjoy." Amendment 3 passed with approximately 66% of the vote and became § 29 of Article I of the Utah Constitution. This opinion will refer to both of the foregoing statutes, along with the constitutional amendment, collectively as "Amendment 3."

Plaintiffs allege that Amendment 3 violates their right to due process under the Fourteenth Amendment by depriving them of the fundamental liberty to marry the person of their choice and to have such a marriage recognized. They also claim that Amendment 3 violates the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs asserted their claims under 42 U.S.C. § 1983, seeking both a declaratory judgment that Amendment 3 is unconstitutional and an injunction prohibiting its enforcement.

On cross motions for summary judgment, the district court ruled in favor of the plaintiffs. It concluded that "[a]ll citizens, regardless of their sexual identity, have a fundamental right to liberty, and this right protects an individual's ability to marry and the intimate choices a person makes about marriage and family." Kitchen v. Herbert, 961 F. Supp. 2d 1181, 1204 (D. Utah 2013). The court further held that Amendment 3 denied plaintiffs equal protection because it classified based on sex and sexual orientation without a rational basis. Id. at 1206-07, 1210-15. It declared Amendment 3

unconstitutional and permanently enjoined enforcement of the challenged provisions. Id. at 1216.

Utah's Governor and Attorney General filed a timely notice of appeal and moved to stay the district court's decision. Both the district court and this court denied a stay. The Supreme Court, however, granted a stay of the district court's injunction pending final disposition of the appeal by this court.

**II**

We first consider the issue of standing, although it was not raised by the parties. See Dias v. City & Cnty. of Denver, 567 F.3d 1169, 1176 (10th Cir. 2009) ("[S]tanding is a component of this court's jurisdiction, and we are obliged to consider it sua sponte to ensure the existence of an Article III case or controversy."). To possess Article III standing, a plaintiff must "establish (1) that he or she has suffered an injury in fact; (2) that the injury is fairly traceable to the challenged action of the defendant; and[] (3) that it is likely that the injury will be redressed by a favorable decision." Awad v. Ziriax, 670 F.3d 1111, 1120 (10th Cir. 2012) (quotations omitted).

Plaintiffs suing public officials can satisfy the causation and redressability requirements of standing by demonstrating "a meaningful nexus" between the defendant and the asserted injury. Bronson v. Swensen, 500 F.3d 1099, 1111-12 (10th Cir. 2007). "[T]he causation element of standing requires the named defendants to possess authority to enforce the complained-of provision," id. at 1110, and "[t]he redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute," id. at 1111. "Whether the Defendants have enforcement authority is

-8-

related to whether, under Ex parte Young, they are proper state officials for suit."
Cressman v. Thompson, 719 F.3d 1139, 1146 n.8 (10th Cir. 2013) (citation omitted).
Under Ex parte Young, a state defendant sued in his official capacity must "have some connection with the enforcement" of a challenged provision. 209 U.S. 123, 157 (1908). "An officer need not have a special connection to the allegedly unconstitutional statute; rather, he need only have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." Chamber of Commerce of the U.S. v. Edmondson, 594 F.3d 742, 760 (10th Cir. 2010) (quotation omitted); see also Finstuen v. Crutcher, 496 F.3d 1139, 1151 (10th Cir. 2007) ("So long as there is [some] connection [with enforcement of the act], it is not necessary that the officer's enforcement duties be noted in the act." (quotation omitted)).

We have no doubt that at least four of the plaintiffs possessed standing to sue the Salt Lake County Clerk based on their inability to obtain marriage licenses from the Clerk's office. Plaintiffs have identified several harms that flow from this denial, including financial injury. See Nova Health Sys. v. Gandy, 416 F.3d 1149, 1155 (10th Cir. 2005) (economic loss may constitute injury-in-fact). Because county clerks are responsible under Utah law for issuing marriage licenses and recording marriage certificates, Utah Code §§ 30-1-7(1) & 30-1-12(1), these plaintiffs' injuries were caused by the Clerk's office and would be cured by an injunction prohibiting the enforcement of Amendment 3. Accordingly, the Salt Lake County Clerk possessed the requisite nexus to plaintiffs' injuries.

The Salt Lake County Clerk, however, has not appealed from the district court's order. We must therefore consider whether the Governor and Attorney General are proper appellants absent the County Clerk. See Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013) ("[S]tanding must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." (quotation omitted)). In Bishop v. Oklahoma ex rel. Edmondson, 333 F. App'x 361 (10th Cir. 2009) (unpublished), we held that Oklahoma's Governor and Attorney General were not proper defendants in a challenge to that state's prohibition on same-sex marriage. Id. at 365. Because of the legal and factual differences between that case and this one, we reach the opposite conclusion as to Utah's Governor and Attorney General.

Our holding in Bishop turned on the conclusion that marriage licensing and recognition in Oklahoma were "within the administration of the judiciary." Id. The district court clerk charged with various duties related to marriage "'is judicial personnel and is an arm of the court . . . subject to the control of the Supreme Court and the supervisory control that it has passed down to the Administrative District Judge in the clerk's administrative district.'" Id. (quoting Speight v. Presley, 203 P.3d 173, 177 (Okla. 2008) (additional internal quotation omitted)). Accordingly, we concluded that "the executive branch of Oklahoma's government has no authority to issue a marriage license or record a marriage." Id.

In Utah, marriage licenses are issued not by court clerks but by county clerks. See Utah Code §§ 17-20-4 (listing duties of county clerks) & 17-53-101 (providing for election of county clerks). The Governor and Attorney General have explicitly taken the

-10-

position in this litigation that they "have ample authority to ensure that" the Salt Lake County Clerk "return[s] to her former practice of limiting marriage licenses to man-woman couples in compliance with Utah law." This assertion is supported by the Utah Code. The Governor is statutorily charged with "supervis[ing] the official conduct of all executive and ministerial officers"[1] and "see[ing] that all offices are filled and the duties thereof performed." § 67-1-1(1) & (2). In addition, he "may require the attorney general to aid any county attorney or district attorney in the discharge of his duties." § 67-1-1(7). Utah law allows an action for the removal of a county officer for "malfeasance in office" to be brought by a "county attorney, or district attorney for the county in which the officer was elected or appointed, or by the attorney general." §§ 77-6-1 & -2.

The Attorney General is required to "exercise supervisory powers over the district and county attorneys of the state in all matters pertaining to the duties of their offices" and "when required by the public service or directed by the governor, assist any county, district, or city attorney in the discharge of his duties." § 67-5-1(6) & (8). A clerk who "knowingly issues a license for any prohibited marriage is guilty of a class A misdemeanor." § 30-1-16. Such charges would be filed by a county or district attorney under the supervision of the Attorney General. See § 17-18a-201 (district and county attorneys act as public prosecutors). And the Governor could order the Attorney General to assist in such prosecution. § 67-1-1(7).

_____

[1] In her answer, the Salt Lake County Clerk stated that her duties are "purely ministerial," and that the "State of Utah controls the content of the form application to be completed by those seeking marriage licenses in the State of Utah."

-11-

The Governor and Attorney General have also demonstrated a "willingness to exercise" their duty to ensure clerks and other state officials enforce Amendment 3. Chamber of Commerce, 594 F.3d at 760 (quotation omitted). The record shows that the Governor coordinated state agencies' response to the district court's order, informing his cabinet:

> For those agencies that now face conflicting laws either in statute or administrative rule, you should consult with the Assistant Attorney Generals assigned to your agency on the best course to resolve those conflicts. You should also advise your analyst in [the Governor's Office of Management and Budget] of the plans for addressing the conflicting laws.
>
> Where no conflicting laws exist you should conduct business in compliance with the federal judge's ruling until such time that the current district court decision is addressed by the 10th Circuit Court.

Thus, state agencies with responsibility for the recognition of out-of-state marriages are being directed by the Governor in consultation with the Attorney General. These officials' authority over such agencies is confirmed by Utah law. For example, Plaintiffs Archer and Call, who were married in Iowa, specifically seek to file joint Utah tax returns. Although the Utah State Tax Commission is charged in the first instance with the duty "to administer and supervise the tax laws of the state," Utah Code § 59-1-210(5), the Attorney General in his constitutional role as "the legal adviser of the State officers," Utah Const. art. VII, § 16, is required by statute to offer his "opinion in writing . . . to any state officer, board, or commission," Utah Code § 67-5-1(7). The Attorney General considers his opinions to the Utah State Tax Commission, even informal ones, to be "authoritative for the purposes" of the Commission "with respect to the specific questions presented." Applicability of Sales & Use Tax to Transfer of Motor Vehicle

from a Partner to a P'ship, Op. Utah Att'y Gen. 86-13 (1987), 1987 Utah AG LEXIS 15, at *22. The Attorney General is empowered to direct the Tax Commission to recognize Archer and Call's Iowa wedding, and the Commission would be legally obligated to follow that instruction and accept a joint tax return. Accordingly, Archer and Call had standing to sue the Attorney General for the injuries caused by Amendment 3's non-recognition provisions. See generally Coll v. First Am. Title Ins. Co., 642 F.3d 876, 892 (10th Cir. 2011) ("Plaintiffs must have standing to seek each form of relief in each claim." (quotation omitted)).

The same is true with respect to the Governor. Utah's "executive power" is "vested in the Governor." Utah Const. art. VII, § 5. In the exercise of that power, the Governor appoints the state's tax commissioners and has the power to initiate proceedings to remove them from office. Utah Code § 59-1-201. Shortly after the Governor sent the above-quoted message to state agencies, the Tax Commission issued a Tax Notice stating that "[s]ame-sex couples who are eligible to file a joint federal income tax return and who elect to file jointly, may also file a joint 2013 Utah Individual Income Tax return." Utah State Tax Commission, Individual Income Tax Returns for Same-Sex Couples for Tax Year 2013 (Jan. 15, 2014) (available at http://tax.utah.gov/notice/2014-01-15.pdf). The Tax Notice refers to the district court's injunction, noting that a stay of that order had not been granted as of December 31, 2013. Id. Thus, one of the injuries explicitly cited by plaintiffs Archer and Call has been at least temporarily redressed by the district court's decision and actions taken in response to it by the Governor after consultation with the Attorney General.

We conclude that the Governor's and the Attorney General's actual exercise of supervisory power and their authority to compel compliance from county clerks and other officials provide the requisite nexus between them and Amendment 3. Although "it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, that does not exclude injury produced by determinative or coercive effect upon the action of someone else." Bennett v. Spear, 520 U.S. 154, 169 (1997) (quotation, alteration, and emphasis omitted). And a state official is a proper defendant if he is "responsible for general supervision of the administration by the local . . . officials" of a challenged provision. Papasan v. Allain, 478 U.S. 265, 282 n.14 (1986) (quotation omitted). This is so even if the state officials are "not specifically empowered to ensure compliance with the statute at issue," if they "clearly have assisted or currently assist in giving effect to the law." Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 828 (10th Cir. 2007) (footnote omitted).

Having concluded that the Governor and Attorney General were properly made defendants below, we hold that they have standing to appeal the district court's decision without participation of the Salt Lake County Clerk. See Finstuen, 496 F.3d at 1151 ("Nothing in Ex Parte Young requires that any appeal of a lower court's judgment involve all named state defendants."). As unsuccessful parties below, both appellants were "injured by the judgment sought to be reviewed." Parr v. United States, 351 U.S. 513, 516 (1956); see also Concorde Res., Inc. v. Woosley (In re Woosley), 855 F.2d 687, 688 (10th Cir. 1988) ("Ordinarily, only a litigant who is a party below and who is aggrieved by the judgment or order may appeal." (quotation and emphasis omitted)).

Both the Governor and the Attorney General are subject to the district court's injunction prohibiting them from enforcing Amendment 3. See Kitchen, 961 F. Supp. 2d at 1216; cf. Hollingsworth, 133 S. Ct. at 2662 (concluding appellants lacked standing to appeal because "the District Court had not ordered [the intervenors] to do or refrain from doing anything"). We thus conclude that standing issues do not prevent us from considering this appeal.

## III

In 1972, the Supreme Court summarily "dismissed for want of substantial federal question" an appeal from the Minnesota Supreme Court upholding a ban on same-sex marriage. Baker, 409 U.S. 810. The state court considered "whether a marriage of two persons of the same sex is authorized by state statutes and, if not, whether state authorization is constitutionally compelled." Baker v. Nelson, 191 N.W.2d 185, 185 (Minn. 1971). It concluded that the statute used the term "marriage" as "one of common usage, meaning the state of union between persons of the opposite sex." Id. at 185-86. The state court further reasoned that "[t]he institution of marriage as a union of man and woman, uniquely involving the procreation and rearing of children within a family, is as old as the book of Genesis" and that "[t]he due process clause of the Fourteenth Amendment is not a charter for restructuring [the institution of marriage] by judicial legislation." Id. at 186. As to the Equal Protection Clause, the court ruled that "[t]here is no irrational or invidious discrimination" because "in commonsense and in a constitutional sense, there is a clear distinction between a marital restriction based merely upon race and one based upon the fundamental difference in sex." Id. at 187.

-15-

The Supreme Court has held that "summary dismissals are, of course, to be taken as rulings on the merits, in the sense that they rejected the specific challenges presented in the statement of jurisdiction and left undisturbed the judgment appealed from." Washington v. Confederated Bands & Tribes of Yakima Indian Nation, 439 U.S. 463, 477 n.20 (1979) (quotation and citation omitted). Summary dismissals

> do not, however, have the same precedential value here as does an opinion of this Court after briefing and oral argument on the merits. A summary dismissal of an appeal represents no more than a view that the judgment appealed from was correct as to those federal questions raised and necessary to the decision. It does not, as we have continued to stress, necessarily reflect our agreement with the opinion of the court whose judgment is appealed.

Id. (citations omitted); see Neely v. Newton, 149 F.3d 1074, 1079 (10th Cir. 1998) ("The Supreme Court has cautioned that for purposes of determining the binding effect of a summary action, the action should not be interpreted as adopting the rationale of the lower court, but rather as affirming only the judgment of that court."). "Summary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction." Mandel v. Bradley, 432 U.S. 173, 176 (1977). And "[t]hey do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." Id. "[I]f the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise." Hicks v. Miranda, 422 U.S. 332, 344 (1975)

(quotation omitted).[2]  The district court concluded that "doctrinal developments" had

superseded Baker.  Kitchen, 961 F. Supp. 2d at 1194-95.  We agree.

Two landmark decisions by the Supreme Court have undermined the notion that

the question presented in Baker is insubstantial.  Baker was decided before the Supreme

Court held that "intimate conduct with another person . . . can be but one element in a

personal bond that is more enduring.  The liberty protected by the Constitution allows

homosexual persons the right to make this choice."  Lawrence v. Texas, 539 U.S. 558,

567 (2003).  The decision in Baker also pre-dates the Court's opinion in Windsor.

Several courts held prior to Windsor that Baker controlled the same-sex marriage

question.  See, e.g., Massachusetts v. U.S. Dep't of Health & Human Servs., 682 F.3d 1,

8 (1st Cir. 2012) ("Baker does not resolve our own case but it does limit the arguments to

ones that do not presume or rest on a constitutional right to same-sex marriage.");

Donaldson v. State, 292 P.3d 364, 371 n.5 (Mont. 2012) ("The U.S. Supreme Court's

action in Baker has been described as binding precedent." (citations omitted)).  However,

since Windsor was decided, nearly every federal court to have considered the issue—

including the district court below—has ruled that Baker does not control.  See Wolf v.

---

[2] Utah argues that "doctrinal developments" are insufficient to undermine a summary disposition, asserting that the Court overruled Hicks in Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477 (1989), in stating that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."  Id. at 484; see also Conover v. Aetna U.S. Healthcare, Inc., 320 F.3d 1076, 1078 n.2 (10th Cir. 2003) ("[T]he Supreme Court instructed us to avoid concluding its more recent cases have, by implication, overruled an earlier precedent." (quotation omitted)).  But both of these cases dealt with opinions on the merits.  We do not read them as overruling the doctrinal developments rule as to summary dispositions.

Walker, No. 14-cv-64-bbc, 2014 U.S. Dist. LEXIS 77125, at *10-18 (W.D. Wis. June 6, 2014); Whitewood v. Wolf, No. 1:13-cv-1861, 2014 U.S. Dist. LEXIS 68771, at *14-18 (M.D. Pa. May 20, 2014); Geiger v. Kitzhaber, Nos. 6:13-cv-01834-MC & 6:13-cv-02256-MC, 2014 U.S. Dist. LEXIS 68171, at *7 n.1 (D. Or. May 19, 2014); Latta v. Otter, No. 1:13-cv-00482-CWD, 2014 U.S. Dist. LEXIS 66417, at *28 (D. Idaho May 13, 2014); DeBoer v. Snyder, No. 12-CV-10285, 2014 U.S. Dist. LEXIS 37274, at *46 n.6 (E.D. Mich. Mar. 21, 2014); De Leon v. Perry, No. SA-13-CA-00982-OLG, 2014 U.S. Dist. LEXIS 26236, at *28-29 (W.D. Tex. Feb. 26, 2014); Bostic v. Rainey, 970 F. Supp. 2d 456, 470 (E.D. Va. 2014); McGee v. Cole, No. 3:13-24068, 2014 U.S. Dist. LEXIS 10864, at *32 (S.D.W. Va. Jan. 29, 2014); Bishop v. United States ex rel. Holder, 962 F. Supp. 2d 1252, 1277 (N.D. Okla. 2014); Kitchen, 961 F. Supp. 2d at 1195. But see Merritt v. Att'y Gen., No. 13-215-BAJ-SCR, 2013 U.S. Dist. LEXIS 163235, at *2 (M.D. La. Oct. 2, 2013), magistrate judge report adopted by 2013 U.S. Dist. LEXIS 162583 (M.D. La. Nov. 13, 2013) (citing Baker as controlling in dismissing pro se complaint, but not considering whether doctrinal developments had undermined Baker).

We acknowledge that the question presented in Windsor is not identical to the question before us. DOMA interfered with New York's decision "that same-sex couples should have the right to marry and so live with pride in themselves and their union and in a status of equality with all other married persons," a decision designed to "correct what its citizens and elected representatives perceived to be an injustice that they had not earlier known or understood." Windsor, 133 S. Ct. at 2689. The "State used its historic and essential authority to define the marital relation in this way," and "its role and its

power in making the decision enhanced the recognition, dignity, and protection of the class in their own community." Id. at 2692. Because DOMA used this "state-defined class for the opposite purpose—to impose restrictions and disabilities," the Court framed the dispositive question as "whether the resulting injury and indignity is a deprivation of an essential part of the liberty protected by the Fifth Amendment." Id. Although it is true that Windsor resolved tension between a state law permitting same-sex marriage and a federal non-recognition provision, the Court's description of the issue indicates that its holding was not solely based on the scope of federal versus state powers.

Appellants stress the presence of these federalism concerns in Windsor, which, as the Chief Justice noted in dissent, "come into play on the other side of the board in . . . cases about the constitutionality of state" bans on same-sex marriage. Id. at 2697 (Roberts, C.J., dissenting). The Windsor majority stated repeatedly that the regulation of marriage has traditionally been a state function. See id. at 2691 ("State laws defining and regulating marriage, of course, must respect the constitutional rights of persons, but, subject to those guarantees, regulation of domestic relations is an area that has long been regarded as a virtually exclusive province of the States." (quotation and citation omitted)); id. ("The states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce . . . ." (quotation and alterations omitted)); id. ("Consistent with this allocation of authority, the Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations."). Appellants urge us to conclude that the "principles of federalism that

-19-

<u>Windsor</u> would later reaffirm" require us to adhere to the Court's summary affirmance in <u>Baker</u>.

However, the <u>Windsor</u> Court also explained that the federal government "in enacting discrete statutes, can make determinations that bear on marital rights and privileges." <u>Id.</u> at 2690. For example, Congress can preempt state marriage laws dealing with insurance proceeds in a federal program, reject sham marriages for immigration purposes even if the marriage is valid under state law, and recognize common-law marriage for the purpose of establishing income-based Social Security benefit eligibility regardless of state law. <u>Id.</u> The <u>Windsor</u> Court concluded it was "unnecessary to decide whether" DOMA "is a violation of the Constitution because it disrupts the federal balance." <u>Id.</u> at 2692.

Rather than relying on federalism principles, the Court framed the question presented as whether the "injury and indignity" caused by DOMA "is a deprivation of an essential part of the liberty protected by the Fifth Amendment." <u>Id.</u> And the Court answered that question in the affirmative:

> The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws. While the Fifth Amendment itself withdraws from Government the power to degrade or demean in the way this law does, the equal protection guarantee of the Fourteenth Amendment makes that Fifth Amendment right all the more specific and all the better understood and preserved.

<u>Id.</u> at 2695 (citations omitted).

"The history of DOMA's enactment and its own text," the Court concluded, "demonstrate that interference with the equal dignity of same-sex marriages, a dignity

conferred by the States in the exercise of their sovereign power, was more than an incidental effect of the federal statute. It was its essence." Id. at 2693. DOMA "impose[d] a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages . . . ." Id. The statute "undermine[d] both the public and private significance of state-sanctioned same-sex marriages" by telling "those couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition." Id. at 2694. And it "humiliate[d] tens of thousands of children now being raised by same-sex couples" by making "it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." Id. Because DOMA's "differentiation demeans [same-sex] couple[s], whose moral and sexual choices the Constitution protects, see Lawrence, 539 U.S. 558, and whose relationship[s] the State has sought to dignify," the Court held that the statute violated the Fifth Amendment. Windsor, 133 S. Ct. at 2694-95.

The Windsor majority expressly cabined its holding to state-recognized marriages, id. at 2696, and is thus not directly controlling. But the similarity between the claims at issue in Windsor and those asserted by the plaintiffs in this case cannot be ignored. This is particularly true with respect to plaintiffs Archer and Call, who seek recognition by Utah of a marriage that is valid in the state where it was performed. More generally, all six plaintiffs seek equal dignity for their marital aspirations. All claim that the state's differential treatment of them as compared to opposite-sex couples demeans and undermines their relationships and their personal autonomy. Although reasonable judges may disagree on the merits of the same-sex marriage question, we think it is clear that

-21-

doctrinal developments foreclose the conclusion that the issue is, as <u>Baker</u> determined, wholly insubstantial.[3]

**IV**

We turn now to the merits of the issue before us. We must first decide whether the liberty interest protected in this case includes the right to marry, and whether that right is limited, as appellants contend, to those who would wed a person of the opposite sex.

The district court granted summary judgment in favor of the plaintiffs. We review a grant of summary judgment de novo. <u>Hobbs ex rel. Hobbs v. Zenderman</u>, 579 F.3d 1171, 1179 (10th Cir. 2009). A party is entitled to summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the movant is entitled to judgment as a matter of law. <u>Id.</u>; <u>see</u> Fed. R. Civ. P. 56(a).

"We review the decision to grant a permanent injunction for abuse of discretion." <u>FTC v. Accusearch Inc.</u>, 570 F.3d 1187, 1201 (10th Cir. 2009). To obtain a permanent injunction, a plaintiff must show: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not

---

[3] Some have suggested that <u>Baker</u> implicates a court's subject matter jurisdiction. <u>See, e.g.</u>, <u>Bostic</u>, 970 F. Supp. 2d at 469 ("Defendants here contend that because the Supreme Court found a substantial federal question lacking in <u>Baker</u>, this Court is precluded from exercising jurisdiction."). Given our conclusion that subsequent doctrinal developments have rendered <u>Baker</u> no longer binding, such an assertion necessarily fails. We further note that because plaintiffs have filed plausible federal constitutional claims pursuant to 42 U.S.C. § 1983, which specifically allows such claims to be filed in federal court, they have presented a federal question sufficient to confer subject matter jurisdiction. <u>See</u> <u>Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.</u>, 545 U.S. 308, 312 (2005) (28 U.S.C. § 1331 "is invoked by and large by plaintiffs pleading a cause of action created by federal law (<u>e.g.</u>, claims under 42 U.S.C. § 1983)").

adversely affect the public interest." Sw. Stainless, LP v. Sappington, 582 F.3d 1176, 1191 (10th Cir. 2009). Because appellants have challenged only the merits aspect of the district court's decision, we do not consider the remaining factors. See Bronson, 500 F.3d at 1104 ("[T]he omission of an issue in an opening brief generally forfeits appellate consideration of that issue.").

## A

"[A]ll fundamental rights comprised within the term liberty are protected by the Federal Constitution from invasion by the States." Planned Parenthood v. Casey, 505 U.S. 833, 846-47 (1992) (quotation omitted). The doctrine of substantive due process extends protections to fundamental rights "in addition to the specific freedoms protected by the Bill of Rights." Washington v. Glucksberg, 521 U.S. 702, 720 (1997); see also Casey, 505 U.S. at 848 ("Neither the Bill of Rights nor the specific practices of States at the time of the adoption of the Fourteenth Amendment marks the outer limits of the substantive sphere of liberty which the Fourteenth Amendment protects."). To qualify as "fundamental," a right must be "objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed." Glucksberg, 521 U.S. at 720-21 (quotations omitted).

## 1

There can be little doubt that the right to marry is a fundamental liberty. The marital relationship is

older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects.

Griswold v. Connecticut, 381 U.S. 479, 486 (1965). The Court has long recognized that marriage is "the most important relation in life." Maynard v. Hill, 125 U.S. 190, 205 (1888). "Without doubt," the liberty protected by the Fourteenth Amendment includes the freedom "to marry, establish a home[,] and bring up children." Meyer v. Nebraska, 262 U.S. 390, 399 (1923); see also Loving v. Virginia, 388 U.S. 1, 12 (1967) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.").

Appellants contend that these precedents and others establish only that opposite-sex marriage is a fundamental right. They highlight the Court's admonition to undertake a "careful description of the asserted fundamental liberty interest." Glucksberg, 521 U.S. at 721 (quotation omitted). "This approach tends to rein in the subjective elements that are necessarily present in due-process judicial review." Id.; see also Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) (courts must exercise "utmost care" and be "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended"). A right to same-sex marriage cannot be deeply rooted in our tradition, appellants argue, because "until recent years, many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage." Windsor, 133 S. Ct. at 2689; see also id. at 2715 (Alito, J.,

dissenting) ("In this country, no State permitted same-sex marriage until the Massachusetts Supreme Judicial Court held in 2003 that limiting marriage to opposite-sex couples violated the State Constitution.").

But "the right to marry is of fundamental importance for all individuals." Zablocki v. Redhail, 434 U.S. 374, 384 (1978). In numerous cases, the Court has discussed the right to marry at a broader level of generality than would be consistent with appellants' argument. The Loving Court concluded that a state statute voiding marriages between white and non-white participants violated the Due Process Clause. 388 U.S. at 4 n.3, 12.

> Marriage is one of the basic civil rights of man, fundamental to our very existence and survival. To deny this fundamental freedom on so unsupportable a basis as the racial classifications embodied in these statutes, classifications so directly subversive of the principle of equality at the heart of the Fourteenth Amendment, is surely to deprive all the State's citizens of liberty without due process of law. The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations. Under our Constitution, the freedom to marry or not marry, a person of another race resides with the individual and cannot be infringed by the State.

Id. at 12 (quotation and citation omitted).

As the Court later explained, "[m]arriage is mentioned nowhere in the Bill of Rights and interracial marriage was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in Loving v. Virginia." Casey, 505 U.S. at 847-48 (citation omitted); see also Lawrence, 539 U.S. at 577-78 ("[N]either history nor tradition could save a law prohibiting miscegenation from

-25-

constitutional attack." (quotation omitted)).  Thus the question as stated in <u>Loving</u>, and as characterized in subsequent opinions, was not whether there is a deeply rooted tradition of interracial marriage, or whether interracial marriage is implicit in the concept of ordered liberty; the right at issue was "the freedom of choice to marry."  <u>Loving</u>, 388 U.S. at 12.

Similarly, <u>Zablocki</u> considered an equal protection challenge to a state law barring individuals in arrearage of child support obligations from marrying.  Because "the right to marry is of fundamental importance" and "the classification at issue . . . significantly interfere[d] with the exercise of that right," the Court determined that "critical examination of the state interests advanced in support of the classification [wa]s required."  <u>Zablocki</u>, 434 U.S. at 383 (quotation omitted).  It cautioned that not "every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny.  To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed."  <u>Id.</u> at 386.  But the statute at issue was impermissible because it constituted a "serious intrusion into [the] freedom of choice in an area in which we have held such freedom to be fundamental" and could not "be upheld unless it [wa]s supported by sufficiently important state interests and [wa]s closely tailored to effectuate only those interests."  <u>Id.</u> at 387, 388.  The right at issue was characterized as the right to marry, not as the right of child-support debtors to marry.

**2**

It is true that both Loving and Zablocki involved opposite-sex couples. Such pairings, appellants remind us, may be naturally procreative—a potentially meaningful consideration given that the Court has previously discussed marriage and procreation together. See Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the race."); Carey v. Population Servs. Int'l, 431 U.S. 678, 684-85 (1977) ("[I]t it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education. The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices." (quotation omitted)).

But the Court has also described the fundamental right to marry as separate from the right to procreate, including in Glucksberg itself, the case upon which appellants' fundamental-right argument turns. See Glucksberg, 521 U.S. at 720 (describing Loving as a right-to-marry case and Skinner as a right-to-procreate case); accord M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996) (same). Appellants' contention that the right to marriage is fundamental because of its procreative potential is also undercut by Turner v. Safley, 482 U.S. 78 (1987).

In Turner, the Court invalidated a prison rule barring inmates from marrying unless a prison superintendent found compelling reasons for the marriage. Id. at 81-82. "[G]enerally only a pregnancy or the birth of an illegitimate child would be considered a compelling reason." Id. at 82. Thus, the challenged rule operated to bar inmates who had

-27-

not procreated from marrying. The Court began its analysis of the marriage restriction by dismissing the argument that "the rule does not deprive prisoners of a constitutionally protected right" even though "the decision to marry is a fundamental right" because "a different rule should obtain in a prison forum." Id. at 94-95 (quotation and ellipses omitted). Despite the "substantial restrictions [imposed] as a result of incarceration," the Court concluded, inmates could not be denied the fundamental right of marriage simply because of their imprisonment. Id. at 95. The right at issue was never framed as "inmate marriage"; the Court simply asked whether the fact of incarceration made it impossible for inmates to benefit from the "important attributes of marriage." Id.; see Latta, 2014 U.S. Dist. LEXIS 66417, at *37 ("Loving was no more about the 'right to interracial marriage' than Turner was about the 'prisoner's right to marry' or Zablocki was about the 'dead-beat dad's right to marry.' Even in cases with such vastly different facts, the Supreme Court has consistently upheld the right to marry, as opposed to a sub-right tied to the facts of the case."); Obergefell v. Wymyslo, 962 F. Supp. 2d 968, 982 n.10 (S.D. Ohio 2013) ("In individual cases regarding parties to potential marriages with a wide variety of characteristics, the Supreme Court consistently describes a general 'fundamental right to marry' rather than 'the right to interracial marriage,' 'the right to inmate marriage,' or 'the right of people owing child support to marry.'").

The Turner Court's description of the "important attributes of marriage [that] remain . . . after taking into account the limitations imposed by prison life," 482 U.S. at 95, is relevant to the case at bar:

-28-

First, inmate marriages, like others, are expressions of emotional support and public commitment. These elements are an important and significant aspect of the marital relationship. In addition, many religions recognize marriage as having spiritual significance; for some inmates and their spouses, therefore, the commitment of marriage may be an exercise of religious faith as well as an expression of personal dedication. Third, most inmates eventually will be released by parole or commutation, and therefore most inmate marriages are formed in the expectation that they ultimately will be fully consummated. Finally, marital status often is a pre-condition to the receipt of government benefits (e.g., Social Security benefits), property rights (e.g., tenancy by the entirety, inheritance rights), and other, less tangible benefits (e.g., legitimation of children born out of wedlock). These incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement or the pursuit of legitimate corrections goals.

Id. at 95-96. The Court ruled that "these remaining elements are sufficient to form a constitutionally protected marital relationship in the prison context" even under the "reasonable relationship test" applicable to prison regulations. Id. at 96-97.[4]

---

[4] The Court distinguished its prior summary affirmance of Johnson v. Rockefeller, 365 F. Supp. 377 (S.D.N.Y. 1973), which upheld a prohibition on marriage for inmates serving a life sentence. Turner, 482 U.S. at 96; see Butler v. Wilson, 415 U.S. 953 (1974) (per curiam) (summary affirmance). Appellants argue that this distinction shows that only those individuals who can procreate have a fundamental right to marry, but the Turner Court did not rely on procreation in distinguishing the summary affirmance in Butler, holding instead that "importantly, denial of the right was part of the punishment for crime" and citing a concurrence for the proposition that the "asserted governmental interest of punishing crime [was] sufficiently important to justify deprivation of [the] right." 482 U.S. at 96. We acknowledge that the three-judge panel in Johnson did mention the impossibility of a life-incarcerated prisoner participating in the "begetting and raising of children," which is described (along with "cohabitation" and "sexual intercourse") as among "the aspects of marriage which make it one of the basic civil rights of man." 365 F. Supp. at 380. But "[b]ecause a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below." Turner, 482 U.S. at 96 (quotation omitted). We thus cannot read the summary affirmance in Butler as standing for the proposition that procreation is an essential aspect of the marriage relationship.

As the Turner opinion highlights, the importance of marriage is based in great measure on "personal aspects" including the "expression[] of emotional support and public commitment." Id. at 95-96. This conclusion is consistent with the Court's other pronouncements on the freedom to marry, which focus on the freedom to choose one's spouse. See Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639-40 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."); see also Hodgson v. Minnesota, 497 U.S. 417, 435 (1990) (plurality opinion)[5] ("[T]he regulation of constitutionally protected decisions, such as where a person shall reside or whom he or she shall marry, must be predicated on legitimate state concerns other than disagreement with the choice the individual has made."); Roberts v. U.S. Jaycees, 468 U.S. 609, 620 (1984) ("[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse . . . ."); Carey, 431 U.S. at 684-85 ("[A]mong the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage . . . ." (quotation omitted)). The Turner Court also highlighted the role of marriage in allowing its participants to gain access to legal and financial benefits they would otherwise be denied. 482 U.S. at 96.

We must reject appellants' efforts to downplay the importance of the personal elements inherent in the institution of marriage, which they contend are "not the principal

---

[5] Hodgson was a splintered decision. Justice Stevens delivered the opinion of the Court as to certain portions of his writing, but the quotation that follows is from a section joined only by Justice Brennan.

interests the State pursues by regulating marriage." Rather than being "[m]utually exclusive" of the procreative potential of marriage, these freedoms—to choose one's spouse, to decide whether to conceive or adopt a child, to publicly proclaim an enduring commitment to remain together through thick and thin—reinforce the childrearing family structure. Further, such freedoms support the dignity of each person, a factor emphasized by the Windsor Court. See 133 S. Ct. at 2692 ("The State's decision to give this class of persons the right to marry conferred upon them a dignity and status of immense import."); id. (New York's "decision enhanced the recognition, dignity, and protection of the class"); id. ("By its recognition of the validity of same-sex marriages performed in other jurisdictions and then by authorizing same-sex unions and same-sex marriages, New York sought to give further protection and dignity to that bond."); id. (plaintiff's relationship was "deemed by the State worthy of dignity in the community equal with all other marriages").

Of course, the Windsor decision dealt with federal recognition of marriages performed under state law. But with respect to plaintiffs Archer and Call, who were married in Iowa and whose marriage Utah will not recognize under Amendment 3, the analogy to Windsor is particularly apt. Amendment 3's non-recognition provision, like DOMA,

> contrives to deprive some couples married under the laws of [another] State, but not other couples, of both rights and responsibilities. . . . By this dynamic [Amendment 3] undermines both the public and private significance of state-sanctioned same-sex marriages; for it tells those couples, and all the world, that their otherwise valid marriages are unworthy of [Utah's] recognition. . . . The differentiation demeans the couple, whose moral and sexual choices the Constitution protects.

-31-

Id. at 2694.

In light of Windsor, we agree with the multiple district courts that have held that

the fundamental right to marry necessarily includes the right to remain married. See

Latta, 2014 U.S. Dist. LEXIS 66417, at *40 ("Idaho's Marriage Laws render the Plaintiff

couples legal strangers, stripping them of the choice to marry or remain married in the

state they call home. Therefore, Idaho's Marriage Laws impermissibly infringe on

Plaintiffs' fundamental right to marry."); Henry v. Himes, No. 1:14-cv-129, 2014 U.S.

Dist. LEXIS 51211, at *22 (S.D. Ohio Apr. 14, 2014) ("There are a number of

fundamental rights and/or liberty interests protected by the Due Process clause that are

implicated by the marriage recognition ban, including the right to marry, the right to

remain married, and the right to parental autonomy." (footnote omitted)); De Leon, 2014

U.S. Dist. LEXIS 26236, at *66 ("[B]y declaring existing, lawful same-sex marriages

void and denying married couples the rights, responsibilities, and benefits of marriage,

Texas denies same-sex couples who have been married in other states their due

process."); Obergefell, 962 F. Supp. 2d at 978 ("The right to remain married is . . .

properly recognized as one that is a fundamental liberty interest appropriately protected

by the Due Process Clause of the United States Constitution.").[6]

---

[6] Appellants contend that § 2 of DOMA forecloses any challenge to the non-recognition provisions of Amendment 3. However, they raise this issue only in a footnote and in conclusory fashion. See In re C.W. Mining Co., 740 F.3d 548, 564 (10th Cir. 2014) ("[A]rguments raised in a perfunctory manner, such as in a footnote, are waived." (quotation and emphasis omitted)). Because we conclude that marriage is a fundamental right and the state's arguments for restricting it to opposite-sex couples fail strict scrutiny, appellants' arguments regarding § 2 of DOMA also fail on the merits.

And although we acknowledge that state recognition serves to "enhance[]" the interests at stake, Windsor, 133 S. Ct. at 2692, surely a great deal of the dignity of same-sex relationships inheres in the loving bonds between those who seek to marry and the personal autonomy of making such choices. As the Court held in Lawrence, several years before discussing the state recognition issues present in Windsor,

> adults may choose to enter upon [an intimate] relationship in the confines of their homes and their own private lives and still retain their dignity as free persons. When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring. The liberty protected by the Constitution allows homosexual persons the right to make this choice.

539 U.S. at 567.

Appellants' assertion that the right to marry is fundamental because it is linked to procreation is further undermined by the fact that individuals have a fundamental right to choose against reproduction. "If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." Eisenstadt v. Baird, 405 U.S. 438, 453 (1972) (emphasis omitted); see also Griswold, 381 U.S. at 485-86 (recognizing right of married individuals to use contraception).

The Court has repeatedly referenced the raising of children—rather than just their creation—as a key factor in the inviolability of marital and familial choices. See, e.g.,

---

Congress cannot authorize a state to violate the Fourteenth Amendment. See Graham v. Richardson, 403 U.S. 365, 382 (1971) ("Congress does not have the power to authorize the individual States to violate the Equal Protection Clause.").

-33-

Carey, 431 U.S. at 685 ("child rearing and education" decisions protected from "unjustified government interference" (quotation omitted)); Moore v. City of East Cleveland, 431 U.S. 494, 505 (1977) (plurality opinion) ("[d]ecisions concerning child rearing" have been "recognized as entitled to constitutional protection"); Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35 (1925) (discussing "the liberty of parents and guardians to direct the upbringing and education of children under their control"); Meyer, 262 U.S. at 399 (liberty protected by the Due Process Clause includes right "to marry, establish a home[,] and bring up children"). Although cohabiting same-sex couples are prohibited from jointly adopting children under Utah law as a result of the same-sex marriage ban, Utah Code § 78B-6-117(3), the record shows that nearly 3,000 Utah children are being raised by same-sex couples. Thus childrearing, a liberty closely related to the right to marry, is one exercised by same-sex and opposite-sex couples alike, as well as by single individuals.[7]

Children of same-sex couples may lack a biological connection to at least one parent, but "biological relationships are not [the] exclusive determina[nt] of the existence of a family." Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 843 (1977). "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction

[7] Utah also permits adoption by unmarried, non-cohabitating individuals if "it is in the best interests of the child to place the child with a single person." Utah Code § 78B-6-117(4)(e). But any person who is cohabitating "in a relationship that is not a legally valid and binding marriage under the laws of this state," § 78B-6-117(3), may not adopt a child, with no explicit exception for the child's best interest.

of children." Id. at 844 (quotation omitted); see also Utah Code § 78B-6-139 (granting adoptive parents all rights and duties of biological parents). As the Court in Windsor held, restrictions on same-sex marriage "humiliate[] tens of thousands of children now being raised by same-sex couples" and "make[] it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." 133 S. Ct. at 2694. Such statutes "bring[] financial harm to children of same-sex couples . . . raise[] the cost of health care for families by taxing health benefits provided by employers to their workers' same-sex spouses" and "den[y] or reduce[] benefits allowed to families upon the loss of a spouse and parent, benefits that are an integral part of family security." Id. at 2695. These laws deny to the children of same-sex couples the recognition essential to stability, predictability, and dignity. Read literally, they prohibit the grant or recognition of any rights to such a family and discourage those children from being recognized as members of a family by their peers.

Appellants urge us to conclude that a court cannot determine whether there is a right to marriage without first defining the institution. They also say that the term "marriage" by its nature excludes same-sex couples. Glucksberg requires us to develop a "careful description of the asserted fundamental liberty interest," relying on "[o]ur Nation's history, legal traditions, and practices [to] provide the crucial guideposts for responsible decisionmaking." 521 U.S. at 721 (quotation omitted). But we cannot conclude that the fundamental liberty interest in this case is limited to the right to marry a person of the opposite sex. As we have discussed, the Supreme Court has traditionally

-35-

described the right to marry in broad terms independent of the persons exercising it.  The Court's other substantive due process cases similarly eschew a discussion of the right-holder in defining the scope of the right.  In Glucksberg, for example, the Court framed the question presented as "whether the 'liberty' specially protected in the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so."  521 U.S. at 723 (footnote omitted).  The Court's formulation implicitly rejected respondents' framing of the claimed liberty as exercised by a specific class of persons:  "Whether the Fourteenth Amendment's guarantee of liberty protects the decision of a mentally competent, terminally ill adult to bring about impending death in a certain, humane, and dignified manner."  Br. of Resp't at i, Glucksberg, 521 U.S. 702 (No. 96-110) (emphasis added).

Prior to the Windsor decision, several courts concluded that the well-established right to marry eo ipso cannot be exercised by those who would choose a spouse of the same sex.  See, e.g., Jackson v. Abercrombie, 884 F. Supp. 2d 1065, 1094-98 (D. Haw. 2012) ("[T]he right at issue here is an asserted new right to same-sex marriage."); Andersen v. King Cnty., 138 P.3d 963, 979 (Wash. 2006) (en banc) ("Plaintiffs have not established that at this time the fundamental right to marry includes the right to marry a person of the same sex."); Hernandez v. Robles, 855 N.E.2d 1, 10 (N.Y. 2006) ("[B]y defining marriage as it has, the New York Legislature has not restricted the exercise of a fundamental right.").  We nonetheless agree with plaintiffs that in describing the liberty interest at stake, it is impermissible to focus on the identity or class-membership of the individual exercising the right.  See De Leon, 2014 U.S. Dist. LEXIS 26236, at *58-59 (a

state "cannot define marriage in a way that denies its citizens the freedom of personal choice in deciding whom to marry, nor may it deny the same status and dignity to each citizen's decision" (quotations omitted)). "Simply put, fundamental rights are fundamental rights. They are not defined in terms of who is entitled to exercise them." Hernandez, 855 N.E.2d at 24 (Kaye, C.J., dissenting); see also Goodridge v. Dep't of Pub. Health, 798 N.E.2d 941, 972-73 (Mass. 2003) (Greaney, J., concurring) ("To define the institution of marriage by the characteristics of those to whom it always has been accessible, in order to justify the exclusion of those to whom it never has been accessible, is conclusory and bypasses the core question . . . ."). Plaintiffs seek to enter into legally recognized marriages, with all the concomitant rights and responsibilities enshrined in Utah law. They desire not to redefine the institution but to participate in it.

Appellants' assertion that plaintiffs are excluded from the institution of marriage by definition is wholly circular. Nothing logically or physically precludes same-sex couples from marrying, as is amply demonstrated by the fact that many states now permit such marriages. See Bostic, 970 F. Supp. 2d at 473 ("Gay and lesbian individuals share the same capacity as heterosexual individuals to form, preserve and celebrate loving, intimate and lasting relationships."). Appellants' reliance on the modifier "definitional" does not serve a meaningful function in this context. To claim that marriage, by definition, excludes certain couples is simply to insist that those couples may not marry because they have historically been denied the right to do so. One might just as easily have argued that interracial couples are by definition excluded from the institution of marriage. But "neither history nor tradition could save a law prohibiting miscegenation

from constitutional attack." Lawrence, 539 U.S. at 577-78 (quotation omitted); see also Williams v. Illinois, 399 U.S. 235, 239 (1970) ("[N]either the antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it through the centuries insulates it from constitutional attack . . . ."); In re Marriage Cases, 183 P.3d 384, 451 (Cal. 2008) ("[E]ven the most familiar and generally accepted of social practices and traditions often mask an unfairness and inequality that frequently is not recognized or appreciated by those not directly harmed by those practices or traditions."), superseded by constitutional amendment as stated in Strauss v. Horton, 207 P.3d 48, 59 (Cal. 2009).

Our conclusion that we are not required to defer to Utah's characterization of its ban on same-sex marriage as a "definition" is reinforced by the Court's opinion in Windsor. Section 3 of DOMA, which the Court invalidated, "amend[ed] the Dictionary Act . . . of the United States Code to provide a federal definition of 'marriage' and 'spouse.'" Windsor, 133 S. Ct. at 2683. In relevant part, the statute read: "'[T]he word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife.'" Id. (quoting 1 U.S.C. § 7). Appellants repeatedly assert that Amendment 3 simply defines marriage, at one point contrasting "the traditional definition of marriage" with "the anti-miscegenation laws invalidated in Loving." They contend that "Utah's marriage laws merely define marriage within its borders." The Court's holding in Windsor demonstrates that a provision labeled a "definition" is not immune from constitutional scrutiny. We see no reason to allow Utah's invocation of its power to "define the marital relation," Windsor, 133 S. Ct. at 2692, to become "a talisman, by

-38-

whose magic power the whole fabric which the law had erected . . . is at once dissolved," Bank of the U.S. v. Dandridge, 25 U.S. (12 Wheat.) 64, 113 (1827) (Marshall, C.J., dissenting).

Whether a state has good reason to exclude individuals from the marital relationship based on a specific characteristic certainly comes into play in determining if the classification survives the appropriate level of scrutiny.  Even when a fundamental right is impinged, "[s]trict scrutiny is not 'strict in theory, but fatal in fact.'"  Grutter v. Bollinger, 539 U.S. 306, 326 (2003) (quoting Adarand Constructors, Inc. v. Peña, 515 U.S. 200, 237 (1995)).  But the challenged classification cannot itself define the scope of the right at issue.  The judiciary's "obligation is to define the liberty of all."  Casey, 505 U.S. at 850.  Although courts may be tempted "to suppose that the Due Process Clause protects only those practices, defined at the most specific level, that were protected against government interference by other rules of law when the Fourteenth Amendment was ratified . . . . such a view would be inconsistent with our law."  Id. at 847 (citation omitted).  "A prime part of the history of our Constitution . . . is the story of the extension of constitutional rights and protections to people once ignored or excluded."  United States v. Virginia, 518 U.S. 515, 557 (1996).

**3**

The Supreme Court's sexual orientation jurisprudence further precludes us from defining the fundamental right at issue in the manner sought by the appellants.  In Lawrence, the Court struck down as violative of due process a statute that prohibited sexual conduct between individuals of the same sex.  The Court reversed Bowers v.

Hardwick, 478 U.S. 186 (1986), which in upholding a similar statute had framed the question as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy and hence invalidates the laws of the many States that still make such conduct illegal and have done so for a very long time." Id. at 190. The Lawrence Court held that this framing "fail[ed] to appreciate the extent of the liberty at stake" and "misapprehended the claim of liberty there presented to it." 539 U.S. at 567.

The Court acknowledged that "for centuries there have been powerful voices to condemn homosexual conduct as immoral," but held that its obligation was "to define the liberty of all, not to mandate our own moral code." Id. at 571 (quotation omitted). "[B]efore 1961 all 50 States had outlawed sodomy," yet "[h]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." Id. at 572 (quotation omitted). The Court firmly rejected Bowers' characterization of the liberty at issue: "To say that the issue in Bowers was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse." Id. at 567.

The Court's rejection of the manner in which Bowers described the liberty interest involved is applicable to the framing of the issue before us. There was clearly no history of a protected right to "homosexual sodomy," just as there is no lengthy tradition of same-sex marriage. But the Lawrence opinion indicates that the approach urged by appellants is too narrow. Just as it was improper to ask whether there is a right to engage

in homosexual sex, we do not ask whether there is a right to participate in same-sex marriage.[8]

We must also note that Lawrence itself alluded to marriage, stating that "our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education." 539 U.S. at 574. The Court quoted Casey's holding that matters "involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment" and ruled that "[p]ersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do." Lawrence, 539 U.S. at 574 (quotation omitted).

The drafters of the Fifth and Fourteenth Amendments "knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom." Id. at 579. A generation ago, recognition of the fundamental right to marry as applying to persons of the same sex might have been unimaginable. A generation ago, the declaration by gay and lesbian couples of what may have been in their hearts would have had to remain unspoken. Not until contemporary times have laws stigmatizing or even criminalizing gay men and women been felled, allowing their relationships to surface to an open society. As the

---

[8] In Seegmiller v. Laverkin City, 528 F.3d 762 (10th Cir. 2008), we concluded that Lawrence did not announce a fundamental right "to engage in private sexual conduct." Id. at 771. As explained above, however, Lawrence did expressly reject Bowers' narrow, class-based framing of the liberty interest at issue.

district court eloquently explained, "it is not the Constitution that has changed, but the knowledge of what it means to be gay or lesbian." Kitchen, 961 F. Supp. 2d at 1203. Consistent with our constitutional tradition of recognizing the liberty of those previously excluded, we conclude that plaintiffs possess a fundamental right to marry and to have their marriages recognized.

**B**

The Due Process Clause "forbids the government to infringe certain fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Reno v. Flores, 507 U.S. 292, 302 (1993) (quotation and emphasis omitted). By the same token, if a classification "impinge[s] upon the exercise of a fundamental right," the Equal Protection Clause requires "the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." Plyler v. Doe, 457 U.S. 202, 216-17 (quotation omitted). Having persuaded us that the right to marry is a fundamental liberty, plaintiffs will prevail on their due process and equal protection claims unless appellants can show that Amendment 3 survives strict scrutiny.

A provision subject to strict scrutiny "cannot rest upon a generalized assertion as to the classification's relevance to its goals." Richmond v. J.A. Croson Co., 488 U.S. 469, 500 (1989). "The purpose of the narrow tailoring requirement is to ensure that the means chosen fit the compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate." Grutter, 539 U.S. at 333 (quotation

omitted).  Only "the most exact connection between justification and classification" survives.  Gratz v. Bollinger, 539 U.S. 244, 270 (2003) (quotation omitted).

Appellants advance four justifications for Amendment 3.  They contend it furthers the state's interests in:  (1) "fostering a child-centric marriage culture that encourages parents to subordinate their own interests to the needs of their children"; (2) "children being raised by their biological mothers and fathers—or at least by a married mother and father—in a stable home"; (3) "ensuring adequate reproduction"; and (4) "accommodating religious freedom and reducing the potential for civic strife."

**1**

We will assume that the first three rationales asserted by appellants are compelling.  These justifications falter, however, on the means prong of the strict scrutiny test.  Each rests on a link between marriage and procreation.  Appellants contend that Utah has "steadfastly sought to reserve unique social recognition for man-woman marriage so as to guide as many procreative couples as possible into the optimal, conjugal childrearing model"; that "children suffer when procreation and childrearing occur outside stable man-woman marriages"; and that "[b]y providing special privileges and status to couples that are uniquely capable of producing offspring without biological assistance from third parties, the State sends a clear if subtle message to all of its citizens that natural reproduction is healthy, desirable and highly valued." (Emphasis omitted.) The common thread running through each of appellants' first three arguments is the claim that allowing same-sex couples to marry "would break the critical conceptual link between marriage and procreation."

The challenged restrictions on the right to marry and on recognition of otherwise valid marriages, however, do not differentiate between procreative and non-procreative couples. Instead, Utah citizens may choose a spouse of the opposite sex regardless of the pairing's procreative capacity. The elderly, those medically unable to conceive, and those who exercise their fundamental right not to have biological children are free to marry and have their out-of-state marriages recognized in Utah, apparently without breaking the "conceptual link between marriage and procreation." The only explicit reference to reproduction in Utah's marriage law is a provision that allows first cousins to marry if "both parties are 65 years of age or older; or . . . if both parties are 55 years of age or older, upon a finding by the district court . . . that either party is unable to reproduce." Utah Code § 30-1-1(2). This statute thus extends marriage rights to certain couples based on a showing of <u>inability</u> to reproduce.[9]

Such a mismatch between the class identified by a challenged law and the characteristic allegedly relevant to the state's interest is precisely the type of imprecision prohibited by heightened scrutiny. <u>See</u> <u>Shaw v. Hunt</u>, 517 U.S. 899, 908 (1996) ("The means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose." (quotation and alteration omitted)). Utah's ban on polygamy, for example, is justified by arguments against polygamy. <u>See</u> Utah Const. art. III ("[P]olygamous or plural marriages are forever prohibited."); <u>see also</u> <u>Potter v. Murray City</u>, 760 F.2d 1065, 1070 (10th Cir. 1985) (concluding that "the State is

---

[9] We do not express any view on the constitutionality of this provision. Instead, we note the inconsistency between the message sent by this statute and the message appellants claim the same-sex marriage ban conveys.

-44-

justified, by a compelling interest, in upholding and enforcing its ban on plural marriage" based on its "commitment to a system of domestic relations based exclusively upon the practice of monogamy" which is "inextricably woven into the fabric of our society" and "the bedrock upon which our culture is built" (quotation omitted)).  Similarly, barring minors from marriage may be justified based on arguments specific to minors as a class.  See Utah Code § 30-1-9 (minors may not marry absent parental consent); see also Ginsberg v. New York, 390 U.S. 629, 638 (1968) ("[E]ven where there is an invasion of protected freedoms the power of the state to control the conduct of children reaches beyond the scope of its authority over adults." (quotation omitted)); Lee v. Gaufin, 867 P.2d 572, 578 (Utah 1993) ("[Minors'] legal incapacity is based on fundamental differences between adults and minors with respect to their physical, intellectual, psychological, and judgmental maturity.").  But appellants fail to advance any argument against same-sex marriage that is based specifically on its alleged intrinsic ills.

Instead of explaining why same-sex marriage qua same-sex marriage is undesirable, each of the appellants' justifications rests fundamentally on a sleight of hand in which same-sex marriage is used as a proxy for a different characteristic shared by both same-sex and some opposite-sex couples.  Same-sex marriage must be banned, appellants argue, because same-sex couples are not naturally procreative.  But the state permits many other types of non-procreative couples to wed.  See Lawrence, 539 U.S. at 605 (Scalia, J., dissenting) ("[W]hat justification could there possibly be for denying the benefits of marriage to homosexual couples . . . ?  Surely not the encouragement of procreation, since the sterile and the elderly are allowed to marry.").  Same-sex marriage

-45-

cannot be allowed, appellants assert, because it is better for children to be raised by biological parents. Yet adoptive parents, who have the full panoply of rights and duties of biological parents, are free to marry. See Utah Code § 78B-6-139 (adoptive parents have same rights and duties). As are opposite-sex couples who choose assisted reproduction. See §§ 78B-15-701 to 707 (providing rules for parental rights in cases of assisted reproduction); §§ 78B-15-801 to 809 (providing rules governing gestational agreements).

Several recent district court decisions have rejected nearly identical state attempts to justify same-sex marriage bans based on procreative concerns. See Geiger, 2014 U.S. Dist. LEXIS 68171, at *43 ("Procreative potential is not a marriage prerequisite."); Latta, 2014 U.S. Dist. LEXIS 66417, at *68 ("Idaho does not condition marriage licenses or marital benefits on heterosexual couples' ability or desire to have children. No heterosexual couple would be denied the right to marry for failure to demonstrate the intent to procreate."); DeBoer, 2014 U.S. Dist. LEXIS 37274, at *37 ("The prerequisites for obtaining a marriage license under Michigan law do not include the ability to have children . . . ."); De Leon, 2014 U.S. Dist. LEXIS 26236, at *44 ("This procreation rationale threatens the legitimacy of marriages involving post-menopausal women, infertile individuals, and individuals who choose to refrain from procreating."); Bostic, 970 F. Supp. 2d. at 478-79 ("The 'for-the-children' rationale also fails because it would threaten the legitimacy of marriages involving post-menopausal women, infertile individuals, and individuals who choose to refrain from procreating.").

The Supreme Court has similarly eschewed such means-ends mismatches. For example, in Bernal v. Fainter, 467 U.S. 216 (1984), the Court concluded that a Texas statute prohibiting resident aliens from becoming notaries failed strict scrutiny. Id. at 227-28. The state argued that the provision was justified by the state's interest in licensing notaries familiar with state law. Id. at 227. But the Court rejected the state's attempt to justify a classification based on alienage with an explanation based on knowledge:

> [I]f the State's concern with ensuring a notary's familiarity with state law were truly compelling, one would expect the State to give some sort of test actually measuring a person's familiarity with the law. The State, however, administers no such test. To become a notary public in Texas, one is merely required to fill out an application that lists one's name and address and that answers four questions pertaining to one's age, citizenship, residency, and criminal record . . . .

Id. (footnote and quotation omitted). Just as a state cannot justify an alienage classification by reference to a separate characteristic such as familiarity with state law, appellants cannot assert procreative potential as a basis to deny marriage rights to same-sex couples. Under strict scrutiny, the state must justify the specific means it has chosen rather than relying on some other characteristic that correlates loosely with the actual restriction at issue.

Utah law sanctions many marriages that share the characteristic—inability to procreate—ostensibly targeted by Amendment 3. The absence of narrow tailoring is often revealed by such under-inclusiveness. In Zablocki, the state attempted to defend its prohibition on marriage by child-support debtors on the ground that the statute "prevent[ed] the applicants from incurring new support obligations." 434 U.S. at 390.

-47-

"But the challenged provisions," the Court explained, "are grossly underinclusive with respect to this purpose, since they do not limit in any way new financial commitments by the applicant other than those arising out of the contemplated marriage." Id. Similarly, in Eisenstadt, the Court rejected the argument that unmarried individuals might be prohibited from using contraceptives based on the view that contraception is immoral. See 405 U.S. at 452-54. The Court held that "the State could not, consistently with the Equal Protection Clause, outlaw distribution to unmarried but not to married persons. In each case the evil, as perceived by the State, would be identical, and the underinclusion would be invidious." Id. at 454; see also Jimenez v. Weinberger, 417 U.S. 628, 637 (1974) (provision of Social Security Act allowing certain illegitimate children benefits under limited circumstances held impermissibly "underinclusive in that it conclusively excludes some illegitimates in appellants' subclass who are, in fact, dependent upon their disabled parent" (quotation omitted)).

A state may not impinge upon the exercise of a fundamental right as to some, but not all, of the individuals who share a characteristic urged to be relevant.

> The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected.

Eisenstadt, 405 U.S. at 454 (quoting Ry. Express Agency v. New York, 336 U.S. 106, 112-13 (1949) (Jackson, J., concurring)).

-48-

A hypothetical state law restricting the institution of marriage to only those who are able and willing to procreate would plainly raise its own constitutional concerns. See id. at 453 ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." (emphasis omitted)). That question is not before us, and we do not address it. We merely observe that a state may not satisfy the narrow tailoring requirement by pointing to a trait shared by those on both sides of a challenged classification.

Appellants suggest that banning all non-procreative individuals from marrying would be impracticable. But "the fact that the implementation of a program capable of providing individualized consideration might present administrative challenges does not render constitutional an otherwise problematic system." Gratz, 539 U.S. at 275 (quotation omitted). And the appellants provide no explanation for Utah Code § 30-1-1(2), which specifically allows a subset of non-procreative couples to marry. Such a law is irreconcilable with appellants' arguments regarding Utah's interest in marriage and procreation.

Among the myriad types of non-procreative couples, only those Utahns who seek to marry a partner of the same sex are categorically excluded from the institution of marriage. Only same-sex couples, appellants claim, need to be excluded to further the state's interest in communicating the link between unassisted biological procreation and marriage. As between non-procreative opposite-sex couples and same-sex couples, we

can discern no meaningful distinction with respect to appellants' interest in fostering biological reproduction within marriages.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Extending the benefits and protections of a civil society to some but not all similarly situated families violates this critical guarantee.

**2**

Appellants argue that procreative couples must be channeled into committed relationships in order to promote the State's interests in childbearing and optimal childrearing. This argument fails because the prohibition on same-sex marriage has an insufficient causal connection to the State's articulated goals.

It is urged upon us that permitting same-sex couples to marry would have far-reaching and drastic consequences for Utah's opposite-sex couples. Appellants contend that the recognition of same-sex marriage would result in a parade of horribles, causing: "parents to raise their existing biological children without the other biological parent" (emphasis omitted); "couples conceiving children without the stability that marriage would otherwise bring"; "a substantial decline in the public's interest in marriage"; "adults to [forgo] or severely limit the number of their children based on concerns for their own convenience"; and "a busy or irresponsible parent to believe it's appropriate to sacrifice his child's welfare to his own needs for independence, free time, etc."

In some instances, courts "must accord substantial deference to the predictive judgments" of legislative authorities. Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195

(1997) ("Turner II") (quotation omitted).[10]  "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable."  Turner I, 512 U.S. at 622.  But even under more relaxed forms of scrutiny, a challenged classification "must find some footing in the realities of the subject addressed by the legislation" based on a "reasonably conceivable state of facts."  Heller v. Doe ex rel. Doe, 509 U.S. 312, 320, 321 (1993) (quotation omitted).[11]

We emphatically agree with the numerous cases decided since Windsor that it is wholly illogical to believe that state recognition of the love and commitment between same-sex couples will alter the most intimate and personal decisions of opposite-sex couples.  As the district court held, "[t]here is no reason to believe that Amendment 3 has any effect on the choices of couples to have or raise children, whether they are opposite-sex couples or same-sex couples."  Kitchen, 961 F. Supp. 2d at 1212.  This was the first of several federal court decisions reaching the same conclusion.  See Geiger, 2014 U.S.

_____

[10] It appears that the only cases in which the Supreme Court has deferred to the predictions of legislators in evaluating the constitutionality of their enactments have involved, at most, intermediate scrutiny.  See City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000) (plurality opinion) (applying the "less stringent standard . . . for evaluating restrictions on symbolic speech" (quotation omitted)); Turner II, 520 U.S. at 213; Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 662 (1994) ("Turner I") (plurality opinion).  These cases also consider circumstances in which lawmaking authorities made factual findings regarding the feared risks before they promulgated the challenged laws, see Erie, 529 U.S. at 297; Turner II, 520 U.S. at 191-225.  Appellants have not directed us to any such findings.

[11] Because we conclude that marriage is a fundamental right, we do not consider whether Amendment 3 passes muster under rational basis review.  Similarly, we do not address whether Amendment 3 might be subject to heightened scrutiny on any alternative basis.

-51-

Dist. LEXIS 68171, at *43 ("[A]ny governmental interest in responsible procreation is not advanced by denying marriage to gay a[nd] lesbian couples. There is no logical nexus between the interest and the exclusion."); DeBoer, 2014 U.S. Dist. LEXIS 37274, at *40 ("Nor does prohibiting same-sex marriage increase the number of heterosexual marriages or the number of children raised by heterosexual parents."); De Leon, 2014 U.S. Dist. LEXIS 26236, at *42-43 ("Defendants have failed to establish how recognizing a same-sex marriage can influence, if at all, whether heterosexual couples will marry, or how other individuals will raise their families."); Bostic, 970 F. Supp. 2d at 478 ("[R]ecognizing a gay individual's fundamental right to marry can in no way influence whether other individuals will marry, or how other individuals will raise families."); Bishop, 962 F. Supp. 2d at 1291 ("Marriage is incentivized for naturally procreative couples to precisely the same extent regardless of whether same-sex couples (or other non-procreative couples) are included.").

Appellants liken the recognition of same-sex marriage to another change in marriage law, arguing that there is "a compelling parallel between the unintended consequences of no-fault divorce, which harmed children by weakening marriage and fatherhood, and the harms that will likely result" from permitting same-sex couples to marry. We cannot accept appellants' claim that allowing same-sex couples to marry is analogous to a law that permits married couples to divorce. The former causes an increase in the number of married individuals, whereas the latter decreases the number of marriages in a state. See Wolf, 2014 U.S. Dist. LEXIS 77125, at *117 ("[T]he no-fault divorce rules that defendants cite actually undermine their argument by showing that [the

state] already supports an 'adult-centric' notion of marriage to some extent by allowing easy divorce even when the couple has children." (emphasis omitted)).

Setting aside the implausibility of the comparison, we observe that Utah has adopted precisely the no-fault divorce regime that appellants decry in their briefing. See Thronson v. Thronson, 810 P.2d 428, 431 n.3 (Utah Ct. App. 1991) ("Utah added 'irreconcilable differences' to its list of nine fault-based grounds [for divorce] in 1987."); Haumont v. Haumont, 793 P.2d 421, 427 (Utah Ct. App. 1990) (irreconcilable differences subsection "is intended to be a no-fault provision"); see also Utah Code § 30-3-1(3)(h) (current location of irreconcilable differences provision). Utah's adoption of one provision that it considers problematic with respect to the communicative function of marriage (no-fault divorce), but not another (same-sex marriage), undermines its claim that Amendment 3 is narrowly tailored to its desired ends. Through its no-fault divorce statute, Utah allows a spouse—the bedrock component of the marital unit—to leave his family whenever he wants and for whatever reason moves him. It is difficult to imagine how the State's refusal to recognize same-sex marriage undercuts in any meaningful way a state message of support for marital constancy given its adoption of a divorce policy that conveys a message of indifference to marital longevity.

A state's interest in developing and sustaining committed relationships between childbearing couples is simply not connected to its recognition of same-sex marriages. Regardless of whether some individuals are denied the right to choose their spouse, the same set of duties, responsibilities, and benefits set forth under Utah law apply to those naturally procreative pairings touted by appellants. We cannot imagine a scenario under

which recognizing same-sex marriages would affect the decision of a member of an opposite-sex couple to have a child, to marry or stay married to a partner, or to make personal sacrifices for a child. We agree with the district court that such decisions, among "the most intimate and personal . . . a person may make in a lifetime, choices central to personal dignity and autonomy," Casey, 505 U.S. at 851, are unrelated to the government's treatment of same-sex marriage. See Kitchen, 961 F. Supp. 2d at 1212. To the extent that they are related, the relation exists because the State of Utah has chosen to burden the ability of one class of citizens to make such intimate and personal choices. See Utah Code § 78B-6-117(3) (prohibiting adoption by "a person who is cohabitating in a relationship that is not a legally valid and binding marriage under the laws of the state" and thus forcing same-sex couples to choose between adoption and marriage).

**3**

Appellants also argue that Utah's ban on same-sex marriage is justified by gendered parenting preferences. They contend that even for families that are not biologically connected, the state has an interest in limiting marriage to opposite-sex couples because "men and women parent children differently."

But a prohibition on same-sex marriage is not narrowly tailored toward the goal of encouraging gendered parenting styles. The state does not restrict the right to marry or its recognition of marriage based on compliance with any set of parenting roles, or even parenting quality. See Latta, 2014 U.S. Dist. LEXIS 66417, at *68 ("Idaho does not withhold marriage licenses from heterosexual couples who might be, or are, non-optimal parents."); DeBoer, 2014 U.S. Dist. LEXIS 37274, at *37 ("The prerequisites for

-54-

obtaining a marriage license under Michigan law do not include . . . a requirement to raise [children] in any particular family structure, or the prospect of achieving certain 'outcomes' for children."); Bishop, 962 F. Supp. 2d at 1295 ("With respect to marriage licenses, the State has already opened the courthouse doors to opposite-sex couples without any moral, procreative, parenting, or fidelity requirements."). Instead, every same-sex couple, regardless of parenting style, is barred from marriage and every opposite-sex couple, irrespective of parenting style, is permitted to marry.

The state's child custody regime also belies adherence to a rigidly gendered view of parents' abilities. See § 30-3-10(1)(a) ("In determining any form of custody, including a change in custody, the court shall consider the best interests of the child without preference for either the mother or father solely because of the biological sex of the parent . . . ."). As with appellants' asserted procreation rationale, we are offered no coherent explanation for the state's decision to impose disabilities upon only one sub-class of those sharing a claimed deficiency.

The Supreme Court has previously rejected state attempts to classify parents with such a broad brush. In Stanley v. Illinois, 405 U.S. 645 (1972), the Court considered the validity of a state law that made children of unwed parents wards of the state upon death of the mother. Id. at 646. The state defended this provision by asserting that "unmarried fathers can reasonably be presumed to be unqualified to raise their children." Id. at 653. "But all unmarried fathers are not in this category; some are wholly suited to have custody of their children." Id. at 654. Just as the state law at issue in Stanley "needlessly risk[ed] running roughshod over the important interests of both parent and child," id. at

657, Amendment 3 cannot be justified by the impermissibly overbroad assumption that any opposite-sex couple is preferable to any same-sex couple. Cf. Skinner, 316 U.S. at 545 ("A law which condemns, without hearing, all the individuals of a class to so harsh a measure as the present because some or even many merit condemnation, is lacking in the first principles of due process.").

Appellants have retreated from any categorical conclusions regarding the quality of same-sex parenting. Although they presented to the district court voluminous scholarship addressing various parenting issues, they now take the position that the social science is unsettled. See Rule 28(j) Letter at 2, No. 13-4178 (10th Cir., filed Apr. 9, 2014) (acknowledging that appellants' main scientific authority on this issue "cannot be viewed as conclusively establishing that raising a child in a same-sex household produces outcomes that are inferior to those produced by man-woman parenting arrangements"). At oral argument, counsel for appellants stated that "the bottom line" regarding the consequences of same-sex parenting "is that the science is inconclusive."

Although we assume that the State's asserted interest in biological parenting is compelling, this assumption does not require us to accept appellants' related arguments on faith. We cannot embrace the contention that children raised by opposite-sex parents fare better than children raised by same-sex parents—to the extent appellants continue to press it—in light of their representations to this court. Appellants' only reasoning in this regard is that there might be advantages in one parenting arrangement that are lacking in the other. On strict scrutiny, an argument based only on pure speculation and conjecture cannot carry the day. See Wisconsin v. Yoder, 406 U.S. 205, 224 (1972) (striking down

state action on strict scrutiny where the argument for the interest was "highly speculative" and had "no specific evidence" to support it). Appellants' tepid defense of their parenting theory further highlights the looseness of the fit between the State's chosen means and appellants' asserted end.

Against the State's claim of uncertainty we must weigh the harm Amendment 3 currently works against the children of same-sex couples. See Obergefell, 962 F. Supp. 2d at 995 (same-sex marriage bans "harm[] the children of same-sex couples who are denied the protection and stability of having parents who are legally married"). If appellants cannot tell us with any degree of confidence that they believe opposite-sex parenting produces better outcomes on the whole—and they evidently cannot—they fail to justify this palpable harm that the Supreme Court has unequivocally condemned. The Windsor majority, stressing the same detrimental impacts of DOMA, explained that the refusal to recognize same-sex marriages brings "financial harm to children of same-sex couples" and makes "it even more difficult for the children [of same-sex couples] to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives." 133 S. Ct. at 2694, 2695.

Windsor thus indicates that same-sex marriage restrictions communicate to children the message that same-sex parents are less deserving of family recognition than other parents. See id. at 2696 ("DOMA instructs all federal officials, and indeed all persons with whom same-sex couples interact, including their own children, that their marriage is less worthy than the marriages of others."). Appellants rely heavily on their predictions that Amendment 3 will encourage adults to make various decisions that

benefit society. But regardless of the signals the law sends to adults, Amendment 3, like

DOMA, conveys a harmful message to the children of same-sex couples. These

collateral consequences further suggest that the fit between the means and the end is

insufficient to survive strict scrutiny. See Latta, 2014 U.S. Dist. LEXIS 66417, at *74

(same-sex marriage bans are "dramatically underinclusive" because they deny "resources

to children whose parents happen to be homosexual"); De Leon, 2014 U.S. Dist. LEXIS

26236, at *42 ("[F]ar from encouraging a stable environment for childrearing, [same sex

marriage bans] den[y] children of same-sex parents the protections and stability they

would enjoy if their parents could marry."); Bostic, 970 F. Supp. 2d at 478 ("[N]eedlessly

stigmatizing and humiliating children who are being raised by the loving couples targeted

by Virginia's Marriage Laws betrays [the state's interest in child welfare].").[12]

**4**

---

[12] We also note, with respect to the first three rationales asserted by appellants, that the same arguments were submitted to the Court in Windsor and rejected. The initial brief filed by the Bipartisan Legal Advisory Group ("BLAG") in that case argued that DOMA was justified based on the "link between procreation and marriage." Initial Br. for BLAG at 44, Windsor, 133 S. Ct. 2675 (No. 12-307). BLAG also argued that refusing to recognize same-sex marriage "offers special encouragement and support for relationships that can result in mothers and fathers jointly raising their biological children" and that "biological differentiation in the roles of mothers and fathers makes it rational to encourage situations in which children have one of each." Id. at 48.

Justice Alito's dissent in Windsor relied on these arguments. 133 S. Ct. at 2718 (Alito, J., dissenting) (asserting that states are free to support the "'traditional' or 'conjugal' view" of "marriage as an intrinsically opposite-sex institution . . . created for the purpose of channeling heterosexual intercourse into a structure that supports child rearing"). The majority did not mention these justifications, but concluded that "DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution." Id. at 2695.

Appellants' fourth and final justification for Amendment 3, "accommodating religious freedom and reducing the potential for civic strife," fails for reasons independent of the foregoing.  Appellants contend that a prohibition on same-sex marriage "is essential to preserving social harmony in the State" and that allowing same-sex couples to marry "would create the potential for religion-related strife."

Even assuming that appellants are correct in predicting that some substantial degree of discord will follow state recognition of same-sex marriage, the Supreme Court has repeatedly held that public opposition cannot provide cover for a violation of fundamental rights.  See, e.g., Palmer v. Thompson, 403 U.S. 217, 226 (1971) ("Citizens may not be compelled to forgo their constitutional rights because officials fear public hostility . . . .").  In Watson v. City of Memphis, 373 U.S. 526 (1963), for example, the Court rejected a city's claim that "community confusion and turmoil" permitted it to delay desegregation of its public parks.  Id. at 535.  And in Cleburne, the Court held that negative attitudes toward the class at issue (intellectually impaired individuals) "are not permissible bases for treating a home for the mentally retarded differently."  473 U.S. at 448.  "It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause, and the city may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic."  Id. (quotation omitted).

Appellants acknowledge that a state may not "invoke concerns about religious freedom or religion-related social strife as a basis for denying rights otherwise guaranteed by the Constitution."  But they argue that the social and religious strife argument

-59-

qualifies as legitimate because a fundamental right is not at issue in this case.  Because we have rejected appellants' contention on this point, their fourth justification necessarily fails.

We also emphasize, as did the district court, that today's decision relates solely to civil marriage.  See Kitchen, 961 F. Supp. 2d at 1214 ("[T]he court notes that its decision does not mandate any change for religious institutions, which may continue to express their own moral viewpoints and define their own traditions about marriage.").  Plaintiffs must be accorded the same legal status presently granted to married couples, but religious institutions remain as free as they always have been to practice their sacraments and traditions as they see fit.  We respect the views advanced by members of various religious communities and their discussions of the theological history of marriage.  And we continue to recognize the right of the various religions to define marriage according to their moral, historical, and ethical precepts.  Our opinion does not intrude into that domain or the exercise of religious principles in this arena.  The right of an officiant to perform or decline to perform a religious ceremony is unaffected by today's ruling.  See Griego v. Oliver, 316 P.3d 865, 871 (N.M. 2013) ("Our holding [that same-sex marriage is required by the state constitution] will not interfere with the religious freedom of religious organizations or clergy because (1) no religious organization will have to change its policies to accommodate same-gender couples, and (2) no religious clergy will be required to solemnize a marriage in contravention of his or her religious beliefs."); Kerrigan v. Comm'r of Pub. Health, 957 A.2d 407, 475 (Conn. 2008) ("Religious freedom will not be jeopardized by the marriage of same sex couples because religious

organizations that oppose same sex marriage as irreconcilable with their beliefs will not be required to perform same sex marriages or otherwise to condone same sex marriage or relations."); In re Marriage Cases, 183 P.3d at 451-52 ("[A]ffording same-sex couples the opportunity to obtain the designation of marriage will not impinge upon the religious freedom of any religious organization, official, or any other person; no religion will be required to change its religious policies or practices with regard to same-sex couples, and no religious officiant will be required to solemnize a marriage in contravention of his or her religious beliefs.").[13]

## C

Appellants raise a number of prudential concerns in addition to the four legal justifications discussed above. They stress the value of democratic decision-making and the benefits of federalism in allowing states to serve as laboratories for the rules concerning marriage. As a matter of policy, it might well be preferable to allow the national debate on same-sex marriage to play out through legislative and democratic channels. Some will no doubt view today's decision as "robbing the winners of an honest victory, and the losers of the peace that comes from a fair defeat." Windsor, 133 S. Ct. at 2711 (Scalia, J., dissenting).

But the judiciary is not empowered to pick and choose the timing of its decisions. "It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants."

---

[13] Although appellants suggest that religious institutions might be subject to hypothetical lawsuits under various scenarios, such lawsuits would be a function of anti-discrimination law, not legal recognition of same-sex marriage.

-61-

Pierson v. Ray, 386 U.S. 547, 554 (1967). Plaintiffs in this case have convinced us that Amendment 3 violates their fundamental right to marry and to have their marriages recognized. We may not deny them relief based on a mere preference that their arguments be settled elsewhere. Nor may we defer to majority will in dealing with matters so central to personal autonomy. The protection and exercise of fundamental rights are not matters for opinion polls or the ballot box. "One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 638 (1943).

Similarly, the experimental value of federalism cannot overcome plaintiffs' rights to due process and equal protection. Despite Windsor's emphasis on state authority over marriage, the Court repeatedly tempered its pronouncements with the caveat that "[s]tate laws defining and regulating marriage, of course, must respect the constitutional rights of persons." 133 S. Ct. at 2691; see also id. at 2692 ("[T]he incidents, benefits, and obligations of marriage are uniform for all married couples within each State, though they may vary, subject to constitutional guarantees, from one State to the next."); id. ("The States' interest in defining and regulating the marital relation, subject to constitutional guarantees, stems from the understanding that marriage is more than a routine classification for purposes of certain statutory benefits."). Our federalist structure is designed to "secure[] to citizens the liberties that derive from the diffusion of sovereign power" rather than to limit fundamental freedoms. New York v. United States, 505 U.S. 144, 181 (1992) (quotation omitted).

Appellants also suggest that today's ruling will place courts on a slippery slope towards recognizing other forms of currently prohibited marriages. Although we have no occasion to weigh in on the validity of laws not challenged in this case, same-sex marriage prohibitions differ in at least one key respect from the types of marriages the appellants identify: Unlike polygamous or incestuous marriages, the Supreme Court has explicitly extended constitutional protection to intimate same-sex relationships, see Lawrence, 539 U.S. at 567, and to the public manifestations of those relationships, Windsor, 133 S. Ct. at 2695. Our holding that plaintiffs seek to exercise a fundamental right turns in large measure on this jurisprudential foundation that does not exist as to the hypothetical challenges identified by appellants.

Another slippery-slope argument brought forward by appellants is that federal constitutional protection for same-sex marriage might lead to the "wholesale 'privatization'" of marriage through the "enactment of a civil-union regime for all couples, with religious and other organizations being free to offer the title of 'marriage' as they see fit." But they provide no authority for the proposition that an unconstitutional restriction on access to an institution can be saved by the possibility that its privileges— or the name attached to them—could be withdrawn from everyone. If a state were entitled to defend the deprivation of fundamental rights in this way, it might always make the same threat.

Lastly, appellants express concern that a ruling in plaintiffs' favor will unnecessarily brand those who oppose same-sex marriage as intolerant. We in no way endorse such a view and actively discourage any such reading of today's opinion.

Although a majority's "traditional[] view[ of] a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice," Lawrence, 539 U.S. at 577 (quoting Bowers, 478 U.S. at 216 (Stevens, J., dissenting)), for many individuals, religious precepts concerning intimate choices constitute "profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives," id. at 571. Courts do not sit in judgment of the hearts and minds of the citizenry. Our conclusion that plaintiffs possess a fundamental right to marry and to have their marriages recognized in no way impugns the integrity or the good-faith beliefs of those who supported Amendment 3. See Wolf, 2014 U.S. Dist. LEXIS 77125, at *4-5 ("In reaching [the] decision [that a same-sex marriage ban is unconstitutional, there is no need] to disparage the legislators and citizens who voted in good conscience for the marriage amendment.").

**V**

In summary, we hold that under the Due Process and Equal Protection Clauses of the United States Constitution, those who wish to marry a person of the same sex are entitled to exercise the same fundamental right as is recognized for persons who wish to marry a person of the opposite sex, and that Amendment 3 and similar statutory enactments do not withstand constitutional scrutiny. We **AFFIRM** the judgment of the district court.

In consideration of the Supreme Court's decision to stay the district court's injunction pending the appeal to our circuit, we conclude it is appropriate to **STAY** our

mandate pending the disposition of any subsequently filed petition for writ of certiorari.[14]

See Fed. R. App. P. 41(d)(2) (allowing circuit courts to stay their mandates pending the completion of certiorari proceedings); Massachusetts v. U.S. Dep't of Health & Human Servs., 682 F.3d at 17 (declaring DOMA § 3 unconstitutional and staying the mandate in the same opinion); Natural Res. Def. Council, Inc. v. Winter, 518 F.3d 704, 705 (9th Cir. 2008) (issuing a stay sua sponte); see also Latta v. Otter, No. 14-35420, Order, at 2 (9th Cir. May 20, 2014) (unpublished) (relying on the Supreme Court's Kitchen order to stay a district court injunction against a same-sex marriage ban); DeBoer v. Snyder, No. 14-1341, Order, at 1 (6th Cir. Mar. 25, 2014) (unpublished) (same).[15]

It is so ordered.

----

[14] If no petition for certiorari is filed, we would lift the stay and issue our mandate when the deadline for filing the petition lapses. See Perry v. Brown, 681 F.3d 1065, 1066-67 (9th Cir. 2012) (per curiam). If a petition for certiorari is filed and denied, we would lift the stay and issue the mandate. See Stafford v. Ward, 60 F.3d 668, 671 (10th Cir. 1995). And if a petition for certiorari is filed and granted, the stay will remain in effect until the Supreme Court resolves the dispute. See id. at 670.

[15] The Supreme Court recently denied without explanation a motion to stay a district court's order enjoining the enforcement of a state's same-sex marriage ban. See Nat'l Org. for Marriage v. Geiger, No. 13A1173, 2014 U.S. LEXIS 3990 (June 4, 2014). We note that in that case the named defendants declined to defend the challenged laws before the district court. Geiger, 2014 U.S. Dist. LEXIS 68171, at *10. A third party, whose motion to intervene in the district court had been denied, sought a stay from the Supreme Court. As a result, the Court may have denied a stay in Geiger for lack of a proper party requesting one. Thus, Geiger does not clearly indicate that the Court no longer wishes to preserve the status quo regarding same-sex marriage in Utah.

No. 13-4178, <u>Kitchen, et al. v. Herbert, et al.</u>

**KELLY**, Circuit Judge, concurring in part and dissenting in part.

I concur with the court's result that Plaintiffs have standing to challenge the provisions at issue,[1] that the Salt Lake County Clerk, Governor, and Attorney General were proper Defendants, and that the appeal may proceed despite the absence of the Salt Lake County Clerk. I disagree with this court's conclusions that (1) <u>Baker v. Nelson</u>, 409 U.S. 810 (1972), need not be followed and that (2) the liberty guaranteed by the Fourteenth Amendment includes a fundamental right which requires Utah to extend marriage to same-gender couples and recognize same-gender marriages from other states. Because I conclude that there is no such fundamental right, it is unnecessary to consider whether Utah's justifications for retaining its repeatedly-enacted concept of marriage pass heightened scrutiny. In my view, the provisions should be analyzed under traditional equal protection analysis and upheld as rationally related to (1) responsible procreation, (2) effective parenting, and (3) the desire to proceed cautiously in this evolving area.

"Same-sex marriage presents a highly emotional and important question of public policy—but not a difficult question of constitutional law," at least when it comes to the States' right to enact laws preserving or altering the traditional composition of marriage. <u>See</u> <u>United States v. Windsor</u>, 133 S. Ct. 2675, 2714 (2013) (Alito, J., dissenting). The Constitution is silent on the regulation of marriage; accordingly, that power is reserved to the States, albeit consistent with federal constitutional guarantees. <u>See</u> <u>Windsor</u>, 133 S.

---

[1] Utah Const. art. I, § 29 and Utah Code §§ 30-1-2(5) (enacted in 1977), 30-1-4.1.

Ct. at 2691-92. And while the Court has recognized a fundamental right to marriage, every decision vindicating that right has involved two persons of the opposite gender. Indeed, the Court has been less than solicitious of plural marriages or polygamy.

If the States are the laboratories of democracy, requiring every state to recognize same-gender unions—contrary to the views of its electorate and representatives—turns the notion of a limited national government on its head. See Bond v. United States, 131 S. Ct. 2355, 2364 (2011) (explaining that federalism allows for state responses instead of relying upon the eventuality of a federal policy). Marriage is an important social institution commonly understood to protect this and future generations. That states sincerely differ about the best way to do this (including whether to extend marriage to same-gender couples) is inevitable. See id.; Utah Code. §§ 30-1-1, -2. And given the recent advent of same-gender marriage, Windsor, 133 S. Ct. at 2689, it is hardly remarkable that a state might codify what was once implicit. For the following reasons, I respectfully dissent.

A.    Baker v. Nelson

The starting point for a claim that same-gender marriage is required by the Constitution must be the Constitution. Because the Constitution does not speak to the issue of same-gender marriage—or marriage at all—the next step is to review the Supreme Court's decisions on the issue. And on the question presented here, the Supreme Court has already spoken. In Baker v. Nelson, the Court dismissed an appeal

asking whether the Constitution forces a state to recognize same-gender marriage "for want of a substantial federal question." 409 U.S. 810 (1972). That dismissal should foreclose the Plaintiffs' claims, at least in this court.

The petitioners in Baker argued that Minnesota's marriage scheme violated due process and equal protection. Jurisdictional Statement, No. 71-1027, at 3-19 (Oct. Term 1972). The Minnesota Supreme Court unambiguously rejected the notion that same-gender marriage was a fundamental right, interpreting Loving v. Virginia as resting upon the Constitution's prohibition of race discrimination. Baker v. Nelson, 191 N.W.2d 185, 187 (Minn. 1971). Absent irrational or invidious discrimination, a "theoretically imperfect" marriage classification does not offend equal protection or due process under the Fourteenth Amendment. Id. The import of Baker to this case is clear: neither due process nor equal protection bar states from defining marriage as between one man and one woman, or require states to extend marriage to same-gender couples.

A summary dismissal is a merits determination and a lower federal court should not come to an opposite conclusion on the issues presented. Mandel v. Bradley, 432 U.S. 173, 176 (1977) (per curiam). The district court relied upon a statement in Hicks v. Miranda that a question remains unsubstantial unless "doctrinal developments" may suggest otherwise. 422 U.S. 332, 344 (1975). On this point, Miranda held that a summary dismissal could not be disregarded. Id. at 344-45. Were there any doubt, the "doctrinal developments" exception was followed by a statement that summary decisions are binding on lower courts until the Court notifies otherwise. Id.

The rule is clear: if a Supreme Court case is directly on point, a lower federal court should rely on it so the Supreme Court may exercise "the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989). The Supreme Court is certainly free to re-examine its precedents, but it discourages lower courts from concluding it has overruled earlier precedent by implication. Agostini v. Felton, 521 U.S. 203, 237 (1997) (reaffirming Rodriguez de Quijas). The majority construes the unequivocal statement in Rodriguez de Quijas (and presumably Agostini) as inapplicable because it appeared in a merits disposition and accordingly did not "overrule" the "doctrinal developments rule" as to summary dispositions. But that is just another way of stating that a summary disposition is not a merits disposition, which is patently incorrect. Though the Supreme Court may not accord Baker the same deference as an opinion after briefing and argument, it is nonetheless precedential for this court. Caban v. Mohammed, 441 U.S. 380, 390 n.9 (1979). Summary dismissals are merits rulings as to those questions raised in the jurisdictional statement. Washington v. Confederated Bands & Tribes of the Yakima Indian Nation, 439 U.S. 463, 476 n.20 (1979).

Plaintiffs argue that Baker did not address the precise issues here because "[t]he judgment affirmed in Baker addressed whether same-sex couples were denied equal protection and due process by Minnesota's marriage statute—a measure that did not indicate on its face whether same-sex couples could marry and that had not been enacted for the express purpose of excluding same-sex couples from marriage." Aplee. Br. 23.

4

They further argue that Utah's non-recognition of Plaintiffs Archer and Call's Iowa marriage distinguishes this case from <u>Baker</u>. Neither reason is persuasive. The fact remains that the Minnesota Supreme Court interpreted the state statute (at the time) to not require same-gender marriage and decided largely the same federal constitutional questions presented here. To the extent there is no right to same-gender marriage emanating from the Fourteenth Amendment, a state should not be compelled to recognize it. <u>See </u>Utah Code § 30-1-4(1) (declining to recognize foreign same-gender marriages).

Regardless, subsequent doctrinal developments have not undermined the Court's traditional deference to the States in the field of domestic relations. To be sure, the district court concluded otherwise based upon the following Supreme Court developments: (1) gender becoming a quasi-suspect class, <u>Craig v. Boren</u>, 429 U.S. 190 (1976); <u>Frontiero v. Richardson</u>, 411 U.S. 677 (1973), (2) invalidation of a state law repealing and barring sexual-orientation protection, <u>Romer v. Evans</u>, 517 U.S. 620 (1996), (3) invalidation of a statute that proscribed same-gender sexual relations insofar as private conduct among consenting adults, <u>Lawrence v. Texas</u>, 539 U.S. 558 (2003), (4) declaring the Defense of Marriage Act's ("DOMA") definition of "marriage" and "spouse" to exclude same-gender marriages as violative of Fifth Amendment due process and equal protection principles, <u>United States v. Windsor</u>, 133 S. Ct. 2675 (2013). <u>Kitchen v. Herbert</u>, 961 F. Supp. 2d 1181, 1194-95 (D. Utah 2013). This court relies on <u>Lawrence</u> and <u>Windsor</u> as justification for not deferring to <u>Baker</u>. As discussed below, none of these developments can override our obligation to follow (rather than lead) on the

5

issue of whether a state is required to extend marriage to same-gender couples. At best, the developments relied upon are ambiguous and certainly do not compel the conclusion that the Supreme Court will interpret the Fourteenth Amendment to require every state to extend marriage to same-gender couples, regardless of contrary state law. See Massachusetts. v. U.S. Dep't of Health & Human Servs., 682 F.3d 1, 8 (1st Cir. 2012) (rejecting the idea that Romer or Lawrence require states to permit same-gender marriage and that the Supreme Court has repudiated Baker).

Because I have not persuaded the panel, I proceed to analyze the remaining issues.


B.      Equal Protection–Gender Discrimination

Plaintiffs argue that defining marriage to exclude same-gender unions is based upon gender stereotyping where "the law presumed women to be legally, socially, and financially dependent upon men." Aplee. Br. at 55-63. But this case involves no disparate treatment based upon gender that might invite intermediate scrutiny. See Craig, 429 U.S. at 197 (such scrutiny requires that the law be substantially related to furthering important governmental interests). Utah's constitutional and statutory provisions, Utah Const. art. I, § 29 and Utah Code §§ 30-1-2(5), 30-1-4.1, enacted in 1977 and 2004, simply define marriage as the legal union of a man and a woman and do not recognize any other domestic union, i.e., same-gender marriage. They apply to same-gender male couples and same-gender female couples alike.

Disparate treatment of men and women as a class is an essential element of an

6

equal protection, gender discrimination claim. See United States v. Virginia, 518 U.S. 515, 519-20 (1996) (women excluded from attending VMI); Miss. Univ for Women v. Hogan, 458 U.S. 718, 719-23 (1982) (men excluded from attending nursing school); Craig, 429 U.S. at 191-92 (women allowed to buy beer at younger age than men); Frontiero, 411 U.S. at 678-79 (women seeking military benefits required to demonstrate the spouse's economic dependency, but not requiring the same of men); Reed v. Reed, 404 U.S. 72-73 (1971) (automatic preference for men over women for estate administration). Plaintiffs cannot show that either gender *as a class* is disadvantaged by the Utah provisions defining marriage.

C.      Equal Protection–Sexual Orientation

Plaintiffs argue that defining marriage to exclude same-gender unions is a form of sexual orientation discrimination triggering heightened scrutiny. Aplee. Br. at 48-55. The Supreme Court has yet to decide the level of scrutiny attendant to classifications based upon sexual orientation, see Windsor, 133 S. Ct. at 2683-84, but this court has rejected heightened scrutiny, see Price-Cornelison v. Brooks, 524 F.3d 1103, 1113 n.9 (10th Cir. 2008); Walmer v. U.S. Dep't of Defense, 52 F.3d 851, 854 (10th Cir. 1995); Jantz v. Muci, 976 F.2d 623, 630 (10th Cir. 1992). Although Plaintiffs argue that our precedent does not justify such a position, one panel of this court may not overrule another absent superseding en banc review or a Supreme Court decision invalidating our precedent. Rezaq v. Nalley, 677 F.3d 1001, 1012 n.5 (10th Cir. 2012). Neither has

occurred here.

D.      Due Process–Fundamental Right

The Plaintiffs contend that they are not relying upon a fundamental right to same-gender marriage, but instead a fundamental right to marriage simpliciter.  Aplee. Br. at 16, 33-39.  They contend that freedom to marry is self-defining and without reference to those who assert it or have been excluded from it.  Id. at 34.  Of course, the difficulty with this is that marriage does not exist in a vacuum; it is a public institution, and states have the right to regulate it.  That right necessarily encompasses the right to limit marriage and decline to recognize marriages which would be prohibited; were the rule as the Plaintiffs contend, that marriage is a freestanding right, Utah's prohibition on bigamy would be an invalid restriction, see Utah Const. art. III; see also Utah Code §§ 30-1-2(1) (bigamy), 30-1-4(1) (non-recognition of such marriages solemnized elsewhere), 76-7-101 (criminalizing bigamy), 76-7-101.5 (criminalizing child bigamy).  That proposition has been soundly rejected.  Reynolds, 98 U.S. at 166-67; Bronson v. Swensen, 500 F.3d 1099, 1105-1106 (10th Cir. 2007); see also Paris Adult Theatre I v. Slaton, 413 U.S. 49, 68 n.15 (1973).  Likewise, were marriage a freestanding right without reference to the parties, Utah would be hard-pressed to prohibit marriages for minors under 15 and impose conditions for other minors.  Utah Code §§ 30-1-2(3), 30-1-9.

As noted, the Court has recognized a fundamental right to marriage protected by substantive due process.  Turner, 482 U.S. at 94; Zablocki, 434 U.S. at 384-86; Loving,

8

388 U.S. at 12.  As such, restrictions on the right are subject to strict scrutiny: they must be narrowly tailored to further compelling state interests.  Zablocki, 434 U.S. at 388; Loving, 388 U.S. at 11-12.  But it is a stretch to cast those cases in support of a fundamental right to same-gender marriage.

Here's why.  First, same-gender marriage is a very recent phenomenon; for centuries "marriage" has been universally understood to require two persons of opposite gender.  Windsor, 133 S. Ct. at 2689.  Indeed, this case is better understood as an effort to extend marriage to persons of the same gender by redefining marriage.  Second, nothing suggests that the term "marriage" as used in those cases had any meaning other than what was commonly understood for centuries.  Courts do not decide what is not before them.  That the Court did not refer to a "right to interracial marriage," or a "right to inmate marriage" cannot obscure what was decided; the Supreme Court announced a right with objective meaning and contours.  Third, given the ephemeral nature of substantive due process, recognition of fundamental rights requires a right deeply rooted in United States history and tradition, and a careful and precise definition of the right at issue.  Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997).  Thus, contrary to Plaintiffs' contention, Aplee. Br. at 34 n.5, it is entirely appropriate for the State to characterize the right sought as one of "same-gender marriage" and focus attention on its recent development.  Perhaps someday same-gender marriage will become part of this country's history and tradition, but that is not a choice this court should make.

Much of this court's opinion is dedicated to finding otherwise by separating

9

marriage from procreation and expounding on how other substantive due process and privacy concepts, including personal autonomy, dignity, family relationships, reproductive rights, and the like, are the antecedents and complements of same-gender marriage. But we should be reluctant to announce a fundamental right by implication. Not only is that beyond our power, it is completely arbitrary and impractical; as in this case, a state should be allowed to adopt change if desired and implement it. As these proceedings demonstrate, the State has a much better handle on what statutory and administrative provisions are involved, and what is necessary to implement change, than we do.

Nothing in the Court's trilogy of cases, <u>Romer</u>, <u>Lawrence</u>, or <u>Windsor</u>, points to a different result. Though the cases may afford constitutional protection for certain "moral and sexual choices" of same gender couples, <u>Windsor</u>, 133 S. Ct. at 2694, they simply have not created a fundamental right to same-gender marriage, let alone heightened scrutiny for any provision which may be implicated. <u>Romer</u> is an equal protection case invalidating a Colorado constitutional provision which effected a "[s]weeping and comprehensive change" in the law by permanently withdrawing and barring anti-discrimination protections against this particular group. 517 U.S. at 627; <u>see</u> <u>Price-Cornelison</u>, 524 F.3d at 1113 n.9 (noting that <u>Romer</u> used a rational basis test). <u>Lawrence</u> also is an equal protection case that invalidated a Texas statute proscribing <u>only</u> same-gender sexual contact, no matter whether private and consensual, because the provision furthered no legitimate state interest. 539 U.S. at 578; <u>id.</u> at 581-83 (O'Connor, J.,

10

concurring); <u>Seegmiller v. LaVerkin City</u>, 528 F.3d 762, 771 (10th Cir. 2008) (noting that <u>Lawrence</u> did not announce a fundamental right to private, consensual sexual activity as it was decided on rational basis review).

Plaintiffs suggest that <u>Lawrence</u> should frame the inquiry as a right to marry rather than a right to same-gender marriage. To be sure, the Court recognized that criminalizing private, consensual conduct for one group interfered with personal autonomy, but the Court expressly disclaimed entering the same-gender union fray. <u>See Lawrence</u>, 539 U.S. at 578; <u>id.</u> at 585 (O'Connor, J., concurring) (noting that "preserving the traditional institution of marriage" would be a legitimate state interest beyond moral disapproval). Moreover, as discussed above, numerous restrictions are already imposed on marriage. It cannot be evaluated devoid of context.

While <u>Windsor</u> is the only Supreme Court case concerning same-gender marriage, it simply did not decide the issue of state prohibitions on same-gender marriages; instead, it concentrated on same-gender marriages already authorized by state law. <u>Windsor</u>, 133 S. Ct. at 2696. It certainly did not require every state to extend marriage to same-gender couples, regardless of the contrary views of the electorate and their representatives. After <u>Windsor</u>, a state remains free (consistent with federal law and comity) to not recognize such marriages. 28 U.S.C. § 1738C. <u>Windsor</u> protected valid same-gender, state law marriages based on federalism concerns, as well as Fifth Amendment due process and implied equal protection concerns. <u>Id.</u> at 2695. As in <u>Lawrence</u>, the Court employed an equal protection construct in determining that "no legitimate purpose" could justify

11

DOMA's unequal treatment of same-gender marriages already authorized by state law. Id. at 2693, 2696.  Given an unusual federal intrusion into state authority, the Court analyzed the nature, purpose, and effect of the federal law, alert for discrimination of "unusual character."  Id. at 2693.

Windsor did not create a fundamental right to same-gender marriage.  To the contrary, Windsor recognized the authority of the States to redefine marriage and stressed the need for popular consensus in making such change. Id. at 2692.  Consistent with federalism, state policies concerning domestic relations and marriage will vary.  Id. at 2691.  Traditionally, the federal government has deferred to those policies, including the definition of marriage.  Id. at 2691, 2693.  Courts should follow suit.

Plaintiffs argue that Windsor dictates the outcome here because we need only look to the purpose and effect of the Utah constitutional amendment defining marriage and not recognizing any other union.  But this case does not involve interference with traditional state prerogatives so it is questionable whether such a directive from Windsor applies.  If it does, Plaintiffs draw only one conclusion: the provision is designed to impose inequality on same-gender couples and their children.  Aplt. Br. at 39-48.  But DOMA is an outlier.  It was unique in not deferring to the States' power to define marriage and instead interfering with the legal effect (or "equal dignity") of those marriages.  In this case, Utah seeks to preserve the status quo and the right of the people to decide this issue.

Not surprisingly, the district court resisted a finding of animus.  Kitchen, 961 F. Supp. 2d at 1209.  That was undoubtedly correct.  The Plaintiffs' one-sided formulation

12

ignores the obvious and real concern that this issue generates both on the merits and procedurally. Nearly everyone is or has been affected from birth by the presence or absence of marriage. In any event, this record hardly reflects "a bare . . . desire to harm a politically unpopular group." U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534-35 (1973). In addition to statements for and against, the Utah legislature's impartial analysis discussed federal constitutional implications. Aplt. App. at 34-48. The power of judicial review is strong medicine, and we should be reluctant to invalidate state constitutional or legislative enactments based upon motive. Rather, it is only an evident and "inevitable unconstitutional effect" that warrants such treatment. United States v. O'Brien, 391 U.S. 367, 385 (1968).

E.    Equal Protection–Rational Basis

Plaintiffs contend and the district court so found that the provisions cannot be sustained under rational basis review. Kitchen, 961 F. Supp. 2d at 1210-15. The State offered several rationales including (1) encouraging responsible procreation given the unique ability of opposite-gender couples to conceive, (2) effective parenting to benefit the offspring, and (3) proceeding with caution insofar as altering and expanding the definition of marriage. The district court rejected these rationales based on a lack of evidence and/or a lack of a rational connection between excluding same-gender couples

13

from marriage and the asserted justification.[2]

Equal protection "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). Given the provisions in this case, we should look at the definition of marriage and the exclusion of same-gender couples and inquire whether "the classification . . . is rationally related to a legitimate state interest." Id. at 440.

To the extent the district court thought that the State had any obligation to produce

_____

[2] On appeal, the State offers a different formulation: (1) "fostering a child-centric marriage culture that encourages parents to subordinate their own interests to the needs of their children," (2) children being raised by their biological mothers and fathers—or at least by a married mother and father—in a stable home, (3) "ensuring adequate reproduction by parents willing and able to provide a high-quality home environment for their children," and (4) accommodating religious freedom and reducing the potential for civic strife." Aplt. Br. at iii. Notwithstanding its endorsement of many similar (though more general) values in the substantive due process discussion, this court is only willing to assume (apparently without deciding) that the first three are compelling.

Be that as it may, Plaintiffs correctly point out that the fourth argument was not raised in the district court. Aplee. Br. at 81 n.26. The State responds that the district court "discussed and rejected this argument in its decision," but the court merely made an offhand comment that religious freedom would be furthered by allowing churches to perform same-gender weddings (if they so choose). Aplee. Reply Br. at 41 n.19 (citing Kitchen, 961 F. Supp. 2d at 1214). The State also argues that rational basis review is not confined to "'explanations of the statute's rationality that may be offered by the litigants or other courts.'" Id. (quoting Kadrmas v. Dickinson Pub. Schs., 487 U.S. 450, 463 (1988)). That may be, but the State as a litigant is offering an explanation that was not preserved. Finally, the State argues that appellate courts may address a waived issue in the public interest or to avoid manifest injustice. Id. We normally conduct appellate review based upon arguments raised in the district court. For those that were not, absent a full plain error argument in the opening brief, we consider such arguments waived. See Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application on appeal[ ]surely marks the end of the road for an argument for reversal not first presented to the district court.").

14

evidence, surely it was incorrect.  <u>Vance v. Bradley</u>, 440 U.S. 93, 110-11 (1979).  Though the State is not precluded from relying upon evidence, rational basis analysis is a legal inquiry.  <u>See</u> <u>Id.</u> at 111-112; <u>see also</u> <u>United States R.R. Ret. Bd. v. Fritz</u>, 449 U.S. 166, 175-77, 179 (1980).  The district court seems to have misunderstood the essence of rational basis review: extreme deference, the hallmark of judicial restraint.  <u>United States v. Alvarez</u>, 132 S. Ct. 2537, 2552 (2012) (Breyer, J., concurring); <u>Fed. Commc'n Comm'n v. Beach Commc'ns</u>, 508 U.S. 307, 314 (1993).  The State could rely upon any plausible reason and contend that the classification might arguably advance that reason.  <u>Armour v. City of Indianapolis</u>, 132 S. Ct. 2073, 2080-81 (2012).  Plaintiffs had the burden of refuting all plausible reasons for the challenged amendment and statutes.  <u>See</u> <u>Vance</u>, 440 U.S. at 111.

Whether a reason actually motivated the electorate or the legislature is irrelevant; neither is required to state its reason for a choice.  <u>See</u> <u>Fritz</u>, 449 U.S. at 179.  Legislative choices involve line-drawing, and the fact that such line-drawing may result in some inequity is not determinative.  <u>See</u> <u>Heller v. Doe</u>, 509 U.S. 312, 321 (1993).  Accordingly, an enactment may be over-inclusive and/or under-inclusive yet still have a rational basis.  The fact that the classification could be improved or is ill-advised is not enough to invalidate it; the political process is responsible for remedying perceived problems.  <u>City of Cleburne</u>, 473 U.S. at 440 ("The Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.").

Judged against these standards, Utah should prevail on a rational basis analysis.

15

Plaintiffs have not overcome their "heavy burden" of demonstrating that the provisions are "arbitrary and irrational," that no electorate or legislature could reasonably believe the underlying legislative facts to be true.  See Kadrmas v. Dickinson Pub. Schs., 487 U.S. 450, 463, 465 (1988).  It is biologically undeniable that opposite-gender marriage has a procreative potential that same-gender marriage lacks.  The inherent differences between the biological sexes are permissible legislative considerations, and indeed distinguish gender from those classifications that warrant strict scrutiny.  See United States v. Virginia, 518 U.S. 515, 533 (1996).  In Nguyen v. I.N.S., for example, the Court upheld a legislative scheme imposing more onerous burdens on unwed fathers than unwed mothers to prove the citizenship of their foreign-born children because of the opportunity for mothers to develop a relationship with their child at childbirth. 533 U.S. 53, 56-59 (2001). The Court recognized important government interests in ensuring both a biological relationship between the citizen and the child and an opportunity to develop a meaningful parent-child relationship.  Id. at 62-65.  The Court stressed the government's critically important "interest in ensuring some opportunity for a tie between citizen father and foreign born child" as a proxy for the opportunity for connection childbirth affords the mother.  Id. at 66.  Nguyen suggests that when it comes to procreation, gender can be considered and that biological relationships are significant interests.

Nor is the State precluded from considering procreation in regulating marriage. Merely because the Court has discussed marriage as a fundamental right apart from procreation or other rights including contraception, child rearing, and education does not

16

suggest that the link between marriage and procreation may not be considered when the

State regulates marriage.  The Court's listing of various rights from time to time is

intended to be illustrative of cases upholding a right of privacy, ensuring that certain

personal decisions might be made "without unjustified government interference."  Carey

v. Population Servs. Int'l, 431 U.S. 678, 684-85 (1977).  Indeed, it is difficult to separate

marriage from procreation considering the State's interest in regulating both.  Even in

Turner, where the Court discussed marriage as a fundamental right for inmates based

upon other advantages of marriage, the Court explained that "most inmate marriages are

formed in the expectation that they will ultimately be fully consummated" and mentioned

the advantage of "legitimation of children born out of wedlock."  482 U.S. at 96.  It goes

without saying that there are procreative and personal dimensions of marriage, but a state

may place greater emphasis on one or the other as it regulates marriage without violating

the Fourteenth Amendment.[3]

It is also undeniable that the State has an important interest in ensuring the well-

being of resulting offspring, be they planned or unplanned.  To that end, the State can

offer marriage and its benefits to encourage unmarried parents to marry and married

parents to remain so.  Thus, the State could seek to limit the marriage benefit to opposite-

---

[3] These permissible considerations easily distinguish this case from Loving v.
Virginia, upon which Plaintiffs rely.  As opposed to the Court-approved interests
furthered by the regulations here, the miscegenation law invalidated in Loving was based
"upon distinctions drawn according to race," and the law furthered only the patently
impermissible pursuit of invidious discrimination (maintaining White Supremacy).  388
U.S. at 11-12.  The Court has always considered racial classifications as different than
those based upon gender, or any other consideration.

17

gender couples completely apart from history and tradition. Far more opposite-gender couples will produce and care for children than same-gender couples and perpetuation of the species depends upon procreation. Consistent with the greatest good for the greatest number, the State could rationally and sincerely believe that children are best raised by two parents of opposite gender (including their biological parents) and that the present arrangement provides the best incentive for that outcome. Accordingly, the State could seek to preserve the clarity of what marriage represents and not extend it.

Of course, other states may disagree. And it is always possible to argue that there are exceptions. But on this issue we should defer. To be sure, the constant refrain in these cases has been that the States' justifications are not advanced by excluding same-gender couples from marriage. But that is a matter of opinion; any "improvement" on the classification should be left to the state political process.

At the very least, same-gender marriage is a new social phenomenon with unknown outcomes and the State could choose to exercise caution. Utah's justifications for not extending marriage to include same-gender couples are not irrefutable. But they don't need to be; they need only be based upon "any reasonably conceivable state of facts." Beach Commc'ns, 508 U.S. at 313. In conducting this analysis, we must defer to the predictive judgments of the electorate and the legislature and those judgments need not be based upon complete, empirical evidence. See Turner Broadcasting System, Inc. v. Fed. Commc'n Comm'n, 512 U.S. 622, 665-66 (1994).

No matter how many times we are reminded that (1) procreative ability and

18

effective parenting are not prerequisites to opposite-gender marriage (exclusion of same-gender couples is under-inclusive), (2) it is doubtful that the behavior of opposite-gender couples is affected by same-gender marriage (lack of evidence), (3) the evidence is equivocal concerning the effects of gender diversity on parenting (lack of evidence) and (4) the present scheme disadvantages the children of same-gender couples (exclusion is over-inclusive),[4] the State's classification does not need to be perfect. It can be under-inclusive and over-inclusive and need only arguably serve the justifications urged by the State. It arguably does.

That the Constitution does not compel the State to recognize same-gender marriages within its own borders demonstrates a fortiori that it need not recognize those solemnized without. Unlike the federal government in <u>Windsor</u>, a state has the "historic and essential authority to define the marital relation" as applied to its residents and citizens. <u>Windsor</u>, 133 S. Ct. at 2691-92. To that end, Utah has the authority to decline to recognize valid marriages from other states that are inconsistent with its public policy choices. <u>See</u> <u>In re Vetas' Estate</u>, 170 P.2d 183, 187 (Utah 1946) (declining to recognize

---

[4] The Court's conclusion that children raised by same-gender couples are somehow stigmatized, <u>see</u> <u>Windsor</u>, 133 S. Ct. at 2694, seems overwrought when one considers that 40.7% of children are now born out of wedlock. <u>See</u> Center for Disease Control and Prevention, FastStats Homepage, available at http://www.cdc.gov/nchs/fastats/unmarried-childbearing.htm (last visited June 24, 2014). Of course, there are numerous alternative family arrangements that exist to care for these children. We should be hesitant to suggest stigma where substantial numbers of children are raised in such environments. Moreover, it is pure speculation that every two-parent household, regardless of gender, desires marriage. <u>See</u> <u>Schuette v. Coalition to Defend Affirmative Action</u>, 134 S. Ct. 1623, 1634 (2014) (plurality opinion) (cautioning against assuming that members of the same group think alike and share the same views).

19

foreign common law marriage when such marriages were not recognized by Utah) (superseded by statute as stated in <u>Whyte v. Blair</u>, 885 P.2d 791, 793 (Utah 1994)).  To conclude otherwise would nationalize the regulation of marriage, thereby forcing each state "to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate."  <u>Baker by Thomas v. Gen. Motors Corp.</u>, 522 U.S. 222, 232 (1998).  Such a result runs in direct contravention of the law of comity between states and its uncontroversial corollary that marriage laws necessarily vary from state to state.  <u>Windsor</u>, 133 S. Ct. at 2691.

The State has satisfied its burden on rational basis review.  One only need consider the reams of sociological evidence urged by the parties and the scores of amicus briefs on either side to know that the State's position is (at the very least) arguable.  It most certainly is not arbitrary, irrational, or based upon legislative facts that no electorate or legislature could conceivably believe.  Though the Plaintiffs would weigh the interests of the State differently and discount the procreation, child-rearing, and caution rationales, that prerogative belongs to the electorate and their representatives.  Or as the Court recently stated:

> The respondents in this case insist that a difficult question of public policy must be taken from the reach of the voters, and thus removed from the realm of public discussion, dialogue, and debate in an election campaign. Quite in addition to the serious First Amendment implications of that position with respect to any particular election, it is inconsistent with the underlying premises of a responsible, functioning democracy.

<u>Schuette v. Coalition to Defend Affirmative Action</u>, 134 S. Ct. 1623, 1637 (2014)

20

(plurality opinion).  We should resist the temptation to become philosopher-kings, imposing our views under the guise of constitutional interpretation of the Fourteenth Amendment.

# APPENDIX A

27 SCHOLARS OF FEDERALISM AND JUDICIAL RESTRAINT

*Attorneys on the Brief:* Anthony T. Caso, John C. Eastman, D. John Sauer

46 EMPLOYERS AND ORGANIZATIONS REPRESENTING EMPLOYERS

*Attorneys on the Brief:* Meghan Bailey, Susan Baker Manning, John V. McDermott, Lauren Schmidt, Margaret Sheer, Michael Louis Whitlock

93 INDIVIDUAL FAITH LEADERS IN OKLAHOMA AND UTAH

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

9TO5, NATIONAL ASSOCIATION OF WORKING WOMEN

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

ACLU OF OKLAHOMA

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

ACLU OF UTAH

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

AFFIRMATION

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

ALL SOULS UNITARIAN CHURCH OF TULSA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

ALLEN, DOUGLAS W.

*Attorneys on the Brief:* David C. Walker

ALLIANCE FOR A BETTER UTAH

*Attorneys on the Brief:* Courtney Bowman, Sarah Kroll-Rosenbaum, Shawn Scott Ledingham

ALVARÉ, HELEN M.

*Attorneys on the Brief:* Richard D. White

AMBROSE, DOUGLAS

*Attorneys on the Brief:* Frank D. Mylar

APPENDIX A

AMERICAN CIVIL LIBERTIES UNION

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

AMERICAN LEADERSHIP FUND

*Attorneys on the Brief:* Frank D. Mylar

AMERICAN MILITARY PARTNER ASSOCIATION

*Attorneys on the Brief:* Abbe David Lowell, Christopher Dowden Man

AMERICAN PSYCHOLOGICAL ASSOCIATION

*Attorneys on the Brief:* Nathalie F.P. Gilfoyle, Paul March Smith

AMERICAN SOCIOLOGICAL ASSOCIATION

*Attorneys on the Brief:* Carmine D. Boccuzzi, Jr., Mark A. Lightner, Andrew P. Meiser, Andra Troy

AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

ANDERSON, JANNA

*Attorneys on the Brief:* Dani Hartvigsen

ANDERSON, RYAN

*Attorneys on the Brief:* Michael Francis Smith

ANTI-DEFAMATION LEAGUE

*Attorneys on the Brief:* Michelle Deutchman, Steven M. Freeman, Seth M. Marnin, Rocky Chiu-feng Tsai

API EQUALITY-LA

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

ASIAN AMERICANS ADVANCING JUSTICE, ASIAN AMERICANS ADVANCING JUSTICE-ASIAN LAW CAUCUS

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

ASIAN AMERICANS ADVANCING JUSTICE-CHICAGO

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

APPENDIX A

AUSTIN LGBT BAR ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

BAR ASSOCIATION OF SAN FRANCISCO

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

BARDAGLIO, PETER

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

BASCH, NORMA

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

BAY AREA LAWYERS FOR INDIVIDUAL FREEDOM

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

BECKET FUND FOR RELIGIOUS LIBERTY

*Attorneys on the Brief:* Eric C. Rassbach, Asma Uddin

BELTRAN, LYNN

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Roberta A. Kaplan, Joshua Kaye, Alan B. Morrison

BELZ, HERMAN

*Attorneys on the Brief:* Frank D. Mylar

BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

BENNE, ROBERT D.

*Attorneys on the Brief:* Frank D. Mylar

BOYLE, DAVID

*Attorneys on the Brief:* David Boyle

CALIFORNIA

*Attorneys on the Brief:* Kamala D. Harris, Peter Sacks

CARBADO, DEVON

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

CARLSON, ALLAN C.

*Attorneys on the Brief:* Frank D. Mylar

CARROLL, JASON S.

*Attorneys on the Brief:* Lynn Dennis Wardle

CATHEDRAL OF HOPE OF OKLAHOMA CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

CATO INSTITUTE

*Attorneys on the Brief:* Ilya Shapiro, Elizabeth B. Wydra

CENTER FOR CONSTITUTIONAL JURISPRUDENCE

*Attorneys on the Brief:* Anthony T. Caso, John C. Eastman, D. John Sauer

CENTRAL CONFERENCE OF AMERICAN RABBIS

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

CHILDREN'S CENTER OF SALT LAKE CITY

*Attorneys on the Brief:* Christy L. Anderson, Sarah Elizabeth April, Kathryn R. DeBord, Stephen D. Gurr

CHRISTENSEN, LAVAR

*Attorneys on the Brief:* Robert Theron Smith

CHURCH OF THE OPEN ARMS OF OKLAHOMA CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

CHURCH OF THE RESTORATION OF TULSA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

CIMARRON ALLIANCE

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

COLAGE

*Attorneys on the Brief:* Christy L. Anderson, Sarah Elizabeth April, Kathryn R. DeBord, Stephen D. Gurr

# APPENDIX A

COLORADO GAY LESBIAN BISEXUAL TRANSGENDER (GLBT) BAR ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

COLORADO WOMEN'S BAR ASSOCIATION

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

CONCERNED WOMEN FOR AMERICA

*Attorneys on the Brief:* Steven W. Fitschen

CONGREGATION KOLAMI OF SALT LAKE CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

CONKLE, DANIEL O.

*Attorneys on the Brief:* Brett Gilbert Scharffs

CONNECTICUT

*Attorneys on the Brief:* George Jepsen, Peter Sacks

CONSTITUTIONAL ACCOUNTABILITY CENTER

*Attorneys on the Brief:* Ilya Shapiro, Elizabeth B. Wydra

CONSTITUTIONAL LAW SCHOLARS

*Attorneys on the Brief:* Lori Ann Alvino McGill, Geoffrey R. Stone

COONTZ, STEPHANIE

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

COTT, NANCY

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

COVENANT NETWORK OF PRESBYTERIANS

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

COX, DUANE MORLEY

*Attorneys on the Brief:* Duane Morley Cox

CURTIS, G.M.

*Attorneys on the Brief:* Frank D. Mylar

DELAWARE

*Attorneys on the Brief:* Joseph R. Biden III, Peter Sacks

DISTRICT OF COLUMBIA

*Attorneys on the Brief:* Irvin B. Nathan, Peter Sacks

DITZ, TOBY L.

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

DOLOVICH, SHARON

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

DUBLER, ARIELA R.

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

EAGLE FORUM EDUCATION & LEGAL DEFENSE FUND

*Attorneys on the Brief:* Lawrence John Joseph

EDWARDS, LAURA F.

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

EGGEBEEN, DAVID J.

*Attorneys on the Brief:* David C. Walker

EIGHTY ONE UTAH STATE LEGISLATORS

*Attorneys on the Brief:* Robert Theron Smith

EMERSON, MICHAEL O.

*Attorneys on the Brief:* Frank D. Mylar

EPISCOPAL DIOCESE OF UTAH

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

# APPENDIX A

EPWORTH UNITED METHODIST CHURCH OF OKLAHOMA CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

EQUAL RIGHTS ADVOCATES

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

EQUALITY UTAH

*Attorneys on the Brief:* Troy L. Booher, Clifford J. Rosky, Noella A. Sudbury, Michael D. Zimmerman

FAMILY EQUALITY COUNCIL

*Attorneys on the Brief:* Christy L. Anderson, Sarah Elizabeth April, Kathryn R. DeBord, Stephen D. Gurr

FAMILY LAW AND CONFLICT OF LAWS PROFESSORS

*Attorneys on the Brief:* Marjory A. Gentry, Joanna L. Grossman, John S. Throckmorton

FAMILY LAW PROFESSORS

*Attorneys on the Brief:* Rita F. Lin, Laura W. Weissbein

FAMILY RESEARCH COUNCIL

*Attorneys on the Brief:* Paul Benjamin Linton

FELLOWSHIP CONGREGATIONAL UNITED CHURCH OF CHRIST OF TULSA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

FIRST UNITARIAN CHURCH OF OKLAHOMA CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

FLUKE, CHARLES

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Roberta A. Kaplan, Joshua Kaye, Alan B. Morrison

FREEDOM TO MARRY

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

FRIENDS FOR LESBIAN, GAY, BISEXUAL, TRANSGENDER, AND QUEER CONCERNS

>*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

GAY & LESBIAN ADVOCATES & DEFENDERS

>*Attorneys on the Brief:* Felicia H. Ellsworth, Mark C. Fleming, Leah M. Litman, Dina Bernick Mishra, Kenneth Lee Salazar, Alan E. Schoenfeld, Paul Reinherz Wolfson

GEORGE, ROBERT P.

>*Attorneys on the Brief:* Michael Francis Smith

GEORGE, TIMOTHY

>*Attorneys on the Brief:* Frank D. Mylar

GIRGIS, SHERIF

>*Attorneys on the Brief:* Michael Francis Smith

GLMA: HEALTH PROFESSIONALS ADVANCING LGBT EQUALITY

>*Attorneys on the Brief:* Nicholas M. O'Donnell

GROSSBERG, MICHAEL

>*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

HADASSAH, THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA, INC.

>*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

HARTOG, HENDRIK

>*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

HAWKINS, ALAN J.

>*Attorneys on the Brief:* David C. Walker

HAYASHI, SCOTT

>*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

HERMAN, ELLEN

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

HINDU AMERICAN FOUNDATION

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

HISPANIC NATIONAL BAR ASSOCIATION

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

HISTORIANS OF ANTIGAY DISCRIMINATION

*Attorneys on the Brief:* Katie D. Fairchild, Madeline H. Gitomer, Jessica Black Livingston, Katherine A. Nelson, Aaron M. Paul, Erica Knievel Songer, Catherine E. Stetson

HODES, MARTHA

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

HOWARD UNIVERSITY SCHOOL OF LAW CIVIL RIGHTS CLINIC

*Attorneys on the Brief:* David Scott Flugman

HUMAN RIGHTS CAMPAIGN

*Attorneys on the Brief:* , Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

HUNTER, NAN D.

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

ILLINOIS

*Attorneys on the Brief:* Lisa Madigan, Peter Sacks

INSTITUTE FOR MARRIAGE AND PUBLIC POLICY

*Attorneys on the Brief:* Jennifer L. Bursch

INTERFAITH ALLIANCE FOUNDATION

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

INTERFAITH ALLIANCE OF COLORADO

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

IOWA

*Attorneys on the Brief:* Tom Miller, Peter Sacks

JAMES, HAROLD

*Attorneys on the Brief:* Frank D. Mylar

JAPANESE AMERICAN CITIZENS LEAGUE

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

JEWISH SOCIAL POLICY ACTION NETWORK

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

JOHNSON, BYRON R.

*Attorneys on the Brief:* David C. Walker

JUSTICE, STEVEN

*Attorneys on the Brief:* Frank D. Mylar

KERBER, LINDA K.

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

KESHET

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

KESSLER-HARRIS, ALICE

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

KOONS, ROBERT C.

*Attorneys on the Brief:* Frank D. Mylar

KURTZ, STANLEY

*Attorneys on the Brief:* Frank D. Mylar

LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.

*Attorneys on the Brief:* Jennifer C. Pizer, Susan Sommer, Camilla Taylor, Kenneth D. Upton

LEADERSHIP CONFERENCE ON CIVIL AND HUMAN RIGHTS

*Attorneys on the Brief:* , Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

LEGAL MOMENTUM

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

LEGAL VOICE

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

LGBT & ALLIED LAWYERS OF UTAH BAR ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

LIBERTY COUNSEL, INC.

*Attorneys on the Brief:* Anita Staver, Mathew D. Staver

LITTLETON, CHRISTINE A.

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

LOPEZ, ROBERT OSCAR

*Attorneys on the Brief:* Dani Hartvigsen

LOVE HONOR CHERISH

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

LUTHERAN CHURCH-MISSOURI SYNOD

*Attorneys on the Brief:* Alexander Dushku, Richard Shawn Gunnarson, Anthony R. Picarello, Justin W. Starr

MAINE

*Attorneys on the Brief:* Janet T. Mills, Peter Sacks

MAINWARING, DOUG

*Attorneys on the Brief:* Dani Hartvigsen

MARRIAGE EQUALITY USA

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

MARYLAND

*Attorneys on the Brief:* Douglas F. Gansler, Peter Sacks

MASSACHUSETTS

*Attorneys on the Brief:* Martha Coakley, Michelle L. Leung, Jonathan B. Miller, Genevieve C. Nadeau, Peter Sacks

MAY, ELAINE TYLER

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

MAYERI, SERENA

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

MAYFLOWER CONGREGATIONAL UNITED CHURCH OF CHRIST OF OKLAHOMA CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

MCDERMOTT, GERALD R.

*Attorneys on the Brief:* Frank D. Mylar

MCHUGH, PAUL

*Attorneys on the Brief:* Gerard Vincent Bradley, Kevin Trent Snider

MCIFF, KAY

*Attorneys on the Brief:* Robert Theron Smith

METHODIST FEDERATION FOR SOCIAL ACTION

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

METROPOLITAN COMMUNITY CHURCHES

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

MINNESOTA LAVENDER BAR ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

MINTZ, STEVE

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

MOORE, RUSSELL

*Attorneys on the Brief:* Frank D. Mylar

MORE LIGHT PRESBYTERIANS

*Attorneys on the Brief:* Samual P Bickett, Kurt M. Denk, Rebecca Harlow, Idin Kashefipour, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman, Rocky Chiu-feng Tsai

MORMONS FOR EQUALITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

MT. TABOR LUTHERAN CHURCH OF SALT LAKE CITY

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

NAACP SALT LAKE BRANCH & NAACP TRI STATE CONFERENCE OF IDAHO, NEVADA AND UTAH

*Attorneys on the Brief:* Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John M. Mejia

NATIONAL ACTION NETWORK

*Attorneys on the Brief:* , Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

NATIONAL ASIAN PACIFIC AMERICA BAR ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

NATIONAL ASSOCIATION FOR RESEARCH AND THERAPY OF HOMOSEXUALITY

*Attorneys on the Brief:* Stephen M. Crampton, Mary Elizabeth McAlister

NATIONAL ASSOCIATION OF EVANGELICALS

*Attorneys on the Brief:* Alexander Dushku, Richard Shawn Gunnarson, Anthony R. Picarello, Justin W. Starr

NATIONAL ASSOCIATION OF WOMEN LAWYERS

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

NATIONAL COUNCIL OF JEWISH WOMEN

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

NATIONAL COUNCIL OF LA RAZA

*Attorneys on the Brief:* , Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

NATIONAL GAY AND LESBIAN TASK FORCE

*Attorneys on the Brief:* , Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

NATIONAL ORGANIZATION FOR WOMEN FOUNDATION

*Attorneys on the Brief:* , Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

NATIONAL PARTNERSHIP FOR WOMEN AND FAMILIES

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

NATIONAL WOMEN'S LAW CENTER

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

NEHIRIM

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

NELSON, MERRILL

*Attorneys on the Brief:* Robert Theron Smith

NERO, NICHOLAS

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Roberta A. Kaplan, Joshua Kaye, Alan B. Morrison

NEW HAMPSHIRE

*Attorneys on the Brief:* Joseph A. Foster, Peter Sacks

NEW MEXICO

*Attorneys on the Brief:* Gary K. King, Peter Sacks

NEW MEXICO LESBIAN AND GAY LAWYERS ASSOCIATION

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

NEW YORK

*Attorneys on the Brief:* Peter Sacks, Eric T. Schneiderman

NEWMAN, ALANA

*Attorneys on the Brief:* Dani Hartvigsen

O'GRADY, CLAUDIA

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Roberta A. Kaplan, Joshua Kaye, Alan B. Morrison

OKLAHOMA CITY UNIVERSITY SCHOOL OF LAW OUTLAWS

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

OKLAHOMANS FOR EQUALITY

*Attorneys on the Brief:*  , Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

OREGON

*Attorneys on the Brief:* Ellen F. Rosenblum, Peter Sacks

OUTSERVE-SLDN

*Attorneys on the Brief:* Abbe David Lowell, Christopher Dowden Man

PAKALUK, CATHERINE R.

*Attorneys on the Brief:* David C. Walker

PAQUETTE, ROBERT

*Attorneys on the Brief:* Frank D. Mylar

PARENTS AND FRIENDS OF EX-GAYS & GAYS

*Attorneys on the Brief:* Arthur Andrew Schulcz, Jr.

PARENTS, FAMILIES AND FRIENDS OF LESBIANS AND GAYS, INC.

*Attorneys on the Brief:* Andrew John Davis, Jiyun Cameron Lee

PEOPLE FOR THE AMERICAN WAY FOUNDATION

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

PERRY, MICHAEL J.

*Attorneys on the Brief:* Brett Gilbert Scharffs

PLECK, ELIZABETH

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

POLIKOFF, NANCY

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

PRESBYTERIAN WELCOME

*Attorneys on the Brief:* Samual P Bickett, Kurt M. Denk, Rebecca Harlow, Idin Kashefipour, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman, Rocky Chiu-feng Tsai

PRICE, JOSEPH

*Attorneys on the Brief:* David C. Walker

PUBLIC ADVOCATES, INC.

*Attorneys on the Brief:* , Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

QLAW - THE GLBT BAR ASSOCIATION OF WASHINGTON

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

RAHE, PAUL A.

*Attorneys on the Brief:* Frank D. Mylar

RECONCILING MINISTRIES NETWORK

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

RECONCILINGWORKS: LUTHERANS FOR FULL PARTICIPATION

*Attorneys on the Brief:* Samual P Bickett, Kurt M. Denk, Rebecca Harlow, Idin Kashefipour, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman, Rocky Chiu-feng Tsai

RECONSTRUCTIONIST RABBINICAL ASSOCIATION

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

RECONSTRUCTIONIST RABBINICAL COLLEGE

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

REGNERUS, MARK D.

*Attorneys on the Brief:* David C. Walker

RELIGIOUS INSTITUTE, INC.

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

REYNOLDS, MICHAEL A.

*Attorneys on the Brief:* Frank D. Mylar

RHODE ISLAND

*Attorneys on the Brief:* Peter F. Kilmartin, Peter Sacks

ROVIG, STANFORD

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Roberta A. Kaplan, Joshua Kaye, Alan B. Morrison

SCHARFFS, BRETT GILBERT

*Attorneys on the Brief:* Brett Gilbert Scharffs

SCHULTZ, VICKI

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

SEARS, BRAD

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

SHAMMAS, CAROLE

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

SHANLEY, MARY

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

SHIFFRIN, SEANA

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

SIKH AMERICAN LEGAL DEFENSE AND EDUCATION FUND

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

SNOW, LOWRY

*Attorneys on the Brief:* Robert Theron Smith

SOCIETY FOR HUMANISTIC JUDAISM

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

SOUTH ASIAN AMERICANS LEADING TOGETHER

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

SOUTHWEST WOMEN'S LAW CENTER

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

ST. STEPHEN'S UNITED METHODIST CHURCH OF NORMAN, OKLAHOMA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

STANLEY, AMY DRU

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

STATE OF ALABAMA

*Attorneys on the Brief:* Thomas Molnar Fisher, Luther Strange

STATE OF ALASKA

*Attorneys on the Brief:* Thomas Molnar Fisher, Michael C. Geraghty

STATE OF ARIZONA

*Attorneys on the Brief:* Thomas Molnar Fisher, Thomas C. Horne

STATE OF COLORADO

*Attorneys on the Brief:* Thomas Molnar Fisher, John Suthers

STATE OF IDAHO

*Attorneys on the Brief:* Thomas Molnar Fisher, Lawrence G. Wasden

STATE OF INDIANA

*Attorneys on the Brief:* Thomas Molnar Fisher, Gregory F. Zoeller

STATE OF KANSAS

*Attorneys on the Brief:* Jeffrey A. Chanay, Bryan Charles Clark

STATE OF MICHIGAN

*Attorneys on the Brief:* Aaron Lindstrom, Bernard Eric Restuccia, Bill Schuette

STATE OF MONTANA

*Attorneys on the Brief:* Thomas Molnar Fisher, Timothy C. Fox

STATE OF NEBRASKA

*Attorneys on the Brief:* Jon Bruning, Thomas Molnar Fisher

STATE OF OKLAHOMA

*Attorneys on the Brief:* Thomas Molnar Fisher, E. Scott Pruitt

STATE OF SOUTH CAROLINA

*Attorneys on the Brief:* Thomas Molnar Fisher, Alan Wilson

STONEWALL BAR ASSOCIATION OF GEORGIA, INC.

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

STONEWALL BAR ASSOCIATION OF MICHIGAN

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

STONEWALL LAW ASSOCIATION OF GREATER HOUSTON

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

STRAUB, D'ARCY WINSTON

*Attorneys on the Brief:* D'Arcy Winston Straub

THE CENTER FOR URBAN RENEWAL AND EDUCATION

*Attorneys on the Brief:* Stephen Kent Ehat

THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

*Attorneys on the Brief:* Alexander Dushku, Richard Shawn Gunnarson, Anthony R. Picarello, Justin W. Starr

THE COALITION OF AFRICAN-AMERICAN PASTORS USA

*Attorneys on the Brief:* Stephen Kent Ehat

THE EQUALITY NETWORK

*Attorneys on the Brief:* , Joshua A. Block, Leah Farrell, Brady R. Henderson, Ryan D. Kiesel, John Mejia

THE ETHICS & RELIGIOUS LIBERTY COMMISSION OF THE SOUTHERN BAPTIST CONVENTION

*Attorneys on the Brief:* Alexander Dushku, Richard Shawn Gunnarson, Anthony R. Picarello, Justin W. Starr

THE FREDERICK DOUGLASS FOUNDATION, INC.

*Attorneys on the Brief:* Stephen Kent Ehat

THE OUTLAWS

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

THE SUTHERLAND INSTITUTE

*Attorneys on the Brief:* William C. Duncan

THE UTAH PSYCHOLOGICAL ASSOCIATION

*Attorneys on the Brief:* Nathalie F.P. Gilfoyle, Paul March Smith

THE WOMEN'S ZIONIST ORGANIZATION OF AMERICA

*Attorneys on the Brief:* Samuel P. Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

TRINITY CHRISTIAN CHURCH OF EDMOND, OKLAHOMA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

T'RUAH: THE RABBINIC CALL FOR HUMAN RIGHTS

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

UNION FOR REFORM JUDAISM

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

UNITARIAN UNIVERSALIST ASSOCIATION

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

UNITED CHURCH OF CHRIST

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

UNITED CHURCH OF NORMAN, OKLAHOMA

*Attorneys on the Brief:* Kurt M. Denk, Jason M. Moff, Norman C. Simon, Jeffrey S. Trachtman

UNITED STATES CONFERENCE OF CATHOLIC BISHOPS

*Attorneys on the Brief:* Alexander Dushku, Richard Shawn Gunnarson, Anthony R. Picarello, Justin W. Starr

UNIVERSITY OF OKLAHOMA COLLEGE OF LAW LEGAL GROUP FOR BUILDING TOLERANCE AND ACCEPTANCE

*Attorneys on the Brief:* Nicole Susan Phillis, Jerome Cary Roth

UPHAM, DAVID R.

*Attorneys on the Brief:* David Robert Upham

UTAH COUNTIES

*Attorneys on the Brief:* Jared W. Eldredge, Lynn Dennis Wardle

UTAH PRIDE CENTER

*Attorneys on the Brief:* Troy L. Booher, Clifford J. Rosky, Noella A. Sudbury, Michael D. Zimmerman

VERMONT

*Attorneys on the Brief:* Peter Sacks, William H. Sorrell

VOICES FOR UTAH CHILDREN

*Attorneys on the Brief:* Christy L. Anderson, Sarah Elizabeth April, Kathryn R. DeBord, Stephen D. Gurr

WASHINGTON

*Attorneys on the Brief:* Robert W. Ferguson, Peter Sacks

WELKE, BARBARA

*Attorneys on the Brief:* Orly Degani, Daniel McNeel Lane, Matthew E. Pepping

WESTERN REPUBLICANS

*Attorneys on the Brief:* Stacy A. Carpenter, Bennett L. Cohen, Jon R. Dedon, Sean Robert Gallagher

WILKEN, ROBERT LOUIS

*Attorneys on the Brief:* Frank D. Mylar

WINKLER, ADAM

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

WOLFE, CHRISTOPHER

*Attorneys on the Brief:* Frank D. Mylar

WOMEN OF REFORM JUDAISM

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

WOMEN'S LAW PROJECT

*Attorneys on the Brief:* Marcia D. Greenberger, Cortelyou Kenney, Emily Martin

WOMEN'S LEAGUE FOR CONSERVATIVE JUDAISM

*Attorneys on the Brief:* Samual P Bickett, Rebecca Harlow, Idin Kashefipour, Rocky Chiu-feng Tsai

WOOD, PETER W.

*Attorneys on the Brief:* Frank D. Mylar

WORTHAM, DOUGLAS

*Attorneys on the Brief:* Jacob Harris Hupart, Jaren Janghorbani, Roberta A. Kaplan, Joshua Kaye, Alan B. Morrison